# Alabama Power Company *v.* Keystone Lime Company.

### *Eminent Domain.*

(Decided November 7, 1914. Rehearing denied January 11, 1915.
67 South. 833.)

1. *Eminent Domain; Compensation; Resulting Damages.*—Where land is taken under eminent domain proceedings, the owner is entitled to the value of the land taken, and to the direct and certain damages resulting to his other lands.

2. *Same.*—Where a right of way for the erection or maintenance of towers, poles and wires for the transmission of electricity is condemned, the owner may recover compensation for the actual damages arising from depreciation in the value of his remaining land, caused by the presence of these things upon the right of way; but mere fears of people from their presence upon the right of way cannot be made a basis on which to predicate such depreciation or affect the amount of the recovery.

3. *Same; Damages; Benefits.*—Where the owner of land taken demands recovery for injuries to his remaining lands, the jury should set off the value of any benefit that may accrue to the remaining land against any resulting damages.

4. *Same.*—Where a power company condemned a right of way for the erection of poles, towers and wires, for the transmission of electricity, and acquired only the surface, any mineral interest therein remaining in the owner, the owner could recover only the value of the surface taken, unaffected by the value of any mineral interest.

APPEAL from Shelby County Court.

Heard before Hon. E. S. LYMAN.

Proceedings by the Alabama Power Company to condemn a right of way for the erection and maintenance of towers, poles, and wire lines for the transmission of electricity on and across the lands of the Keystone Lime Company. From a judgment awarding damages, petitioner appeals. Reversed and remanded.

KNOX, ACKER, DIXON & SIMS, and THOMAS W. MARTIN, for appellant.

RIDDLE, ELLIS & RIDDLE, for appellee.

DE GRAFFENRIED, J.—By this proceeding the appellant sought to condemn a strip of land 100 feet in width across the lands of appellee as a right of way upon which to erect and maintain towers, poles, or wire lines for the transmission of electricity. After the court made the order condemning the above strip, and before the trial in which the damages were assessed by the jury, the appellant, as under our Constitution and statutes it had the right to do, placed its towers, poles, and conductors on the strip, and is now using it for the purposes for which it was condemned. This appeal is taken, not from the judgment of condemnation, but from the judgment pronounced upon the verdict of the jury assessing the appellant's damages.

During the trial by jury of the issue as to the amount of the appellee's damages, the evidence showed what the appellant has done and is doing in the use of the strip of land, and what use the strip may be, under the rights which appellant acquired by its judgment of condemnation, put to in the future. The conductors of appellant are strung on steel towers. These towers are 75 feet high and each weighs about 4,500 pounds. Upon these towers are cross-arms which support the conductors, and the lowest cross-arm on any tower is 47 feet from the ground. From each cross-arm hangs a string of insulators, and the lowest conductor of electricity is thus, at the tower, at least 42 feet from the ground. The towers are placed from each other at such distance that the nearest point at which a conductor approaches the ground is 25 feet. The conductors are copper cables, and there are six conductors now in use. The conductors are strung with a pull of about 1,400 pounds, and a conductor will itself break at a pull of 6,000 pounds.

"The towers are so placed that the lowest conductor or cable will at no place be nearer than 25 feet of the ground, and the height of the lowest cable will vary from 25 to 43 feet above the ground. The cables are strung on three cross-arms, one cable being strung on the end of each cross-arm, thereby placing three cables on each side of the towers. The highest cable is 67 feet above the ground. The towers are composed of steel, the tower being completely covered with a coat of zinc so that it will not rust. The towers are fastened to anchors which extend into the ground 7½ feet and at the base of the anchors, is a grillage about 2½ feet square, pieces of iron that extend out at right angles which are about 2½ feet square at the base. * * * The towers were composed of four posts, which were in form angular, which posts are anchored in the ground and which extended to the top of the steel work. These four posts are braced together with steel strips or bars. The base of each tower covers a space of 15 feet square. The tops of the towers are strung to what are called ground wires or cables, each three-eighths of an inch in diameter and made of high-grade galvanized steel, and each of which is so strong that it would lift about 20 bales of cotton without breaking. These steel cables are placed on the towers 3 feet above the first cross-arm, which is the very highest point of the towers, and they extend from one tower to another above the copper conductor, thereby tying the whole row of towers together. The towers as constructed are designed to stand a velocity of wind of 70 miles an hour, and the breaking of three conductors in addition thereto. Each conductor will support a weight of 6,000 pounds without breaking. The maximum weight under any condition that will be placed on each conductor will be 3,000 pounds, so they will stand twice as much as will be

placed on them; that, for a wind 70 miles an hour to affect these towers, three of the cables would also have to be broken. A wind blowing 70 miles would, no doubt, not blow over these towers unless three of the cables were broken. Wind at 70 miles an hour is about 20 miles higher than any wind that has been recorded in the last six years, either at the weather station at Montgomery or Birmingham. A person could go to a distance of 3½ feet of these cables when they are charged with electricity without danger; so, the lowest being 25 feet above the ground, it would be more than 20 feet beyond the danger line of any person or animal. If one of the cables should break and fall to the ground, the electrical current will immediately be shut off at the station by what is called circuit breakers, which is automatically done, and which occurs immediately upon the cable touching the ground. If the broken cable should touch another wire, the current would instantly be shut off; that, is automatically.   *   *   *   The steel ground wires placed on top of the towers act as a shield to the copper conductors, so that lightning will strike the ground wires and be immediately conducted into the ground through the steel towers. There is no increased danger from being near the tower lines during a thunderstorm. The tower lines and electrical currents on the cable have no detrimental effect on crops or trees or anything growing on the land over which the cables stand—do not injure them in any way."

The above quotations mark a part of a witness' testimony, and from his testimony and the photographs accompanying the transcript we gather that, so far as the strip of land is concerned, where it runs through woodlands, the trees have been cleared from it, and that steel towers with cables upon them have been erected along the middle of the condemned strip; the dis-

tance between the towers being 750 feet. Photographs accompanying the transcript indicate that, where such towers are placed in cultivated fields, no great impediment is thereby created, even at the points where the towers are anchored to the ground, to the cultivation of the right of way, and that no impediment whatever is created by the towers to the cultivation of the right of way at points between the anchoring points of the towers. There resides, however, in appellant, at all times, whenever its reasonable necessities may require it to do so, the right to go up or down the right of way for the purpose of repairing any breakage in its right of way, or for other reasonable purposes, and, of course, if its business should require it, appellant may, in the future, place other towers upon the right of way.

In its practical use of this land for the purposes for which it has been condemned, appellant has up to the present time made no changes upon the surface of the earth, except to cut the trees from the surface of the right of way and to place some towers 750 feet apart and some telephone posts upon it. The towers are attached to steel anchors, which have been sunk or driven 6 or 7 feet into the earth, and this appears to be all that has been done to the land up to the present time. In the future some other towers may be placed on the right of way, but the uses to which the right of way may be put are not, however, exclusive in appellant. Appellee may use the right of way for any purpose which does not conflict with the paramount rights of appellant. For instance, subject to the above rights of appellant, appellee has the right to cultivate the land, to go across it, and generally, as already said, to use it in any way which does not affect the paramount rights of appellant. Appellant has no right—and

[Alabama Power Company v. Keystone Lime Company.]

there is, in the nature of things, no reason for it—to fence either side of the right of way.

(1) 1. There is evidence tending to show that the lands indicated in the strip are in the mineral district. The condemnation proceedings do not touch the appellant's ownership of the minerals on the strip, if there are minerals there, nor do they preclude the appellee from taking the minerals therefrom, provided this is done in such a way as not to obstruct the use by appellant of so much of the surface as it may now need or may need in the future for the proper maintenance of its appliances for conducting electricity. When a railroad company condemns a right of way, it has the exclusive right to the use of the entire surface of the right of way, so long as the right of way remains in use for railroad purposes. The railroad company may place as many tracks on its right of way as it sees proper, may fence it, and in fact possesses the right to the exclusive use of the surface. The ultimate fee which resides in the owner of the land after such a condemnation is therefore of but little practical value. When, therefore, such a condemnation is had, the damages of the owner of the land, in so far as the right of way is concerned, are the actual value of the land, no more and no less. His entire damages in such a case are the actual value of the land actually condemned and the damages, if any, which have resulted to his other lands, out of which the right of way is carved, by reason of the existence of the right of way through his land. The damages resulting to the owner of the lands not condemned—the lands out of which the right of way is carved—are the difference in its actual fair value before and after the condemnation. In estimating the amount of such resultant damages, the jury should consider only such injuries as will naturally result from

the appropriation of the right of way for the permanent uses for which it was condemned, and "only such injuries as are ascertainable at the time of the construction of the improvement should be considered."—*Young v. Harrison*, 17 Ga. 30; *Chicago, etc., R. R. Co. v. Hunter*, 128 Ind. 213, 27 N. E. 477; 15 Cyc. 715, subd. B, and authorities collated in notes 74 and 75. The resultant damages must be the direct and certain—not remote and speculative—damages which will accrue to the remaining lands by reason of the presence of the right of way through such lands, and the uses to which such right of way is to be put.

· 2. In this case, then, in so far as the 100-foot strip is concerned, the appellee is entitled to recover of the appellant the value of the easement which has been sequestered to the use of the appellant. The right of way, it appears, takes up about 14 acres of the appellee's land. The question then is: What was the fair, actual value of that 14 acres before its sequestration for appellant's uses, and how much is its fair actual value to appellee, for the purposes to which appellee may lawfully put it, since its appropriation to the uses of appellant? The difference between the two values will fix the amount which should be awarded appellee on account of the land condemned for such right of way. The difference between the actual fair value of the land actually condemned and its fair actual value for the uses to which appellee may lawfully put it since the condemnation is the true amount of the loss which has been occasioned appellee by reason of this condemnation proceeding in so far as the right of way, considered alone, is concerned.—*Mobile & Ohio Railroad Co. v. Postal Tel. Cable Co.*, 120 Ala 21, 24 South. 408; *A. & F. R. R. Co. v. Burkett*, 42 Ala. 83; *Odum v. Rutledge & Julian R. R. Co.*, 94 Ala. 488, 10 South. 222.

[Alabama Power Company v. Keystone Lime Company.]

"The exercise of the power being necessary for the public good, and all property, being held, subject to its exercise when and as the public good requires it, it would be unjust to the public that it should be required to pay the owner more than a fair indemnity for the loss he sustains by the appropriation of his property for the general good." Lewis on Eminent Domain (2d Ed.) vol. 2, p. 397, § 462.

(2, 3) In so far as the lands of appellee which are not condemned are concerned, the only question is: How much have those lands been depreciated—if any—by the location of the right of way of appellant over said lands, considered in connection with the uses to which appellant has put and will in the future put the right of way as above indicated? Is the tract of appellee, with the right of way running through it and subject to the above-named uses of appellant, of any less actual value for the uses to which said lands are adapted —viz., for quarrying lime, making bricks, farming, and probably for pasturage—than it was before appellant began to use the right of way? Is the tract of land— leaving out of consideration the value of the 100-foot strip—of appellee of any less actual value since the towers and telephone poles have been placed upon the 100-foot strip, with the cables upon the towers and telephone wires upon the poles, than it was before the towers and poles were erected upon the strip and the cables and telephone wires placed as they are now hung above the earth? Does the fact that appellant, in addition to the maintenance of the towers and cables which it now has on said land, may, if it becomes necessary erect other towers and maintain other cables upon the said 14 acres in such other ways as may be necessary for furnishing electric current to the public, decrease the actual value of the remainder of the tract? If so,

then appellee is also entitled to recover of appellant the value of such actual depreciation.

From the evidence in this case, read in connection with the photographs which have come into our hands, we gather that on account of the distance of the towers as they now stand from each other, their height, the elevation of the lowest points of the cables from the earth, the strength and size of the cables, the long life of the towers and cables, and the fact that the cables are so connected with appliances that, if one should break, such cable will instantly lose its electrical character and become harmless, the presence of the towers now upon appellee's land places no greater servitude upon the right of way and is attendant with no greater injury to the remainder of appellee's land than would accompany a similar right of way sequestered for and used by an ordinary telegraph company. The cables of appellant are, it is true, so heavily charged with electricity that, if a human being comes in contact with or within 2 or 3 feet of them while they are charged with electricity, death will be the result. These cables are, however, attached to steel towers, and are 25 feet above the ground at their lowest points on the right of way. They are, therefore, too far removed from the earth to be attended with danger to human beings so long as they use the surface of the ground in the ordinary and customary way, viz., by cultivating it, walking or riding upon it, or by hauling loads in wagons or other vehicles upon it. We not only think that the evidence discloses the above situation, but we think that human experience indicates it. Electricity not properly controlled is one of the most dangerous agencies known to man; properly controlled, it is not only of great practical value, but its use, under proper control, is attendant with as few dangers to life as any other agency

[Alabama Power Company v. Keystone Lime Company.]

which human ingenuity has been able to place at our disposal. It would seem, therefore, that the mere fact that the appellant has strung across appellee's land, as above indicated, cables which are heavily charged with electricity at the lowest point of 25 feet from the surface of the earth, and which cables, if breakage occurs, will automatically become instantly innocuous, can have no bearing upon the question as to the loss which appellee has suffered in the adjacent lands through which the right of way runs by reason of the condemnation of the strip of land. The mere fact that people have fears that injury may possibly occur at some time to some person by reason of the cables cannot be considered by the triers of the facts.

While public service corporations are permitted to exercise the right of eminent domain, and thus acquire against even an unwilling owner valuable rights in his land, it is the public interest, and not the private right of the public service corporation or its stockholders, which confers upon such corporation the right of eminent domain. The public is as deeply interested in the proper supply of wholesome water, in the proper conduct of electricity from the sources of supply to the points of distribution to the public, and, in short, in all the modern methods of meeting the demands of the people for transportation, light, heat, communication, etc., as it is in the matter of courthouses, public roads, public parks, etc. While, through condemnation proceedings, rights are sometimes acquired which are exclusively public, and at other times such rights are acquired by a corporation whose energies are directed to meeting public demands, in every instance it is the public right, and not the private interest, which gives rise to the extraordinary right of eminent domain. The right of eminent domain resides exclusively in and is a nec-

[Alabama Power Company v. Keystone Lime Company.]

essary attribute of the state, and the state, in permitting its exercise, either does so—as, for instance, in condemning lands for courthouses, jails, public roads, parks, etc.—directly and exclusively for the public, or indirectly for the public by requiring property condemned to another's use to be actually used for the public benefit. For this reason the rule seems to be well settled that: In all condemnation proceedings, "the exercise of the power being necessary for the public good, and all property being held subject to its exercise when and as the public good requires it, it would be unjust to the public that it should be required to pay to the owner more than a fair indemnity for the loss he sustains by the appropriation of his property for the general good. On the other hand, it would be equally unjust to the owner if he should receive less than a fair indemnity for such loss. To arrive at this fair indemnity, the interests of the public and of the owner, and all the circumstances of the particular appropriation, should be taken into consideration."—Lewis on Eminent Domain (2d Ed.), § 462.

While, therefore, it is the intent of the law that all the actual damages which may naturally and proximately result to the remainder of a man's tract of land by reason of the condemnation of a right of way for a public purpose across it shall be paid to him, the law will not permit mere speculative elements of damages, based upon an ill-defined fear that at some unknown and indefinite time in the future some misfortune may come to some man or beast by reason of such improvement, to enter into the consideration of those who, under the law, are required to fix the amount of the damages. The rights of the party condemning are confined to the lands taken, and for any damage which in the future may be done by the condemning party to persons or

property on adjoining lands—as by "blasting, by occupation or encroachment, by depositing debris upon it, or by using it as a roadway"—a suit may be brought and a recovery may be had whenever the tortious act, from which such damages arise, is committed.—Lewis on Eminent Domain (2d Ed.), vol 2, §§ 573, 574.

In our cities and towns electric wires charged with sufficient electricity to kill a human being are placed up and down the streets upon wooden poles at elevations less than 20 feet above the earth's surface, and are found, when properly kept and insulated, to be sufficiently guarded to meet without appreciable danger to the public all of the demands of public travel, whether by pedestrians or by vehicles, upon such streets. The evidence in this case discloses that the steel towers of appellant are much more firmly grounded than are the usual wooden poles upon which are strung the wires of the ordinary company which supplies electrical power to the cities and towns of the state. It also shows that appellant's cables are much larger than the wires in ordinary use, and that, in addition to being more firmly attached to their supports than the ordinary wires, they are so connected with the source of their electrical supply as that, if one breaks, it at once loses its electrical current and becomes a dead wire. In other words, the evidence in this case shows, without dispute, that the appellant, in installing its fixtures upon the 100-foot strip, has met all reasonable and known precautions to avoid injury to any one who may be at work, in any way, upon the earth's surface on the right of way.

The trial court, therefore, in our opinion, committed reversible error in orally charging the jury as follows: "If there was a general fear in the community of the operation of that line, so that it affected the value of the land, you would consider that; but the mere fact

that possibly in the future somebody might be hurt by that line, it might break or any sort of accident happen, or even if it was not properly constructed, if there was a possibility of damaging some person by the fault of construction or by the negligent operation, or anything of that sort, you do not take that into consideration, except as I have told you, if it affects the value of the remaining portion of the land, because the law requires that line to be constructed in a proper manner and in a manner that would be reasonably safe to all persons who are called or have to be around, and if it is not done, and injury or damages results to any person from the negligence of the operator, either in the construction or maintenance of it, that is a separate question which would be determined by another suit. In other words, you cannot look to any speculative damage in this case, anything that might possibly, by some mishap or otherwise, arise in the future; but all damage to which the respondent here is entitled has already accrued, and accrued to it at the time this land was taken by the petitioner. Consequently it is not for you to go out into the future and speculate on what else may accrue in the future. All his rights and damages, and damages to which he is entitled, have accrued now. Of course, as I told you, if the fear of the operation of this line is prevalent in the community, and it affects the value of the remaining tract of land, then it is proper for you to allow such weight as you think it is entitled to, and to assess or determine the amount of diminution in value of the property on that account."

It may be, as the evidence tends to show, that there has never been in the neighborhood of this property a line similar to that of appellant, and that, as the people in that neighborhood know that the cables are heavily charged with electricity, they are afraid to go in

[Alabama Power Company v. Keystone Lime Company.]

the neighborhood of it. Having no actual knowledge of the practical operation and effect of such lines, they may, as some of the testimony tends to show, be afraid of the property on which the lines are situated. A large per centage of the agencies which now conserve human effort are, when negligently controlled, dangerous to human life, and many things now daily used upon our streets and upon our public highways were, when they were first introduced, objects of terror to those who knew nothing about them. When the automobile was first introduced, especially in our towns, villages, and country neighborhoods, the driver of the automobile was regarded at least with disfavor, because he was known to be in possession of a dangerous instrument. Now, however, while still dangerous when negligently driven, automobiles are in common use upon all of our highways, are regarded as one of the usual vehicles in which to travel, and their owners are probably in large measure responsible for more and better public roads. If it be true that some people who have not grown accustomed to lines similar to that of appellant are afraid of this improvement, and that therefore they are not now willing to buy appellee's lands, the law can furnish to appellee no remedy therefor, and cannot regard depreciation created by such a cause as resting upon any substantial basis. The law can and will see that appellee is justly compensated for the rights which appellant has acquired in the condemned strip, and if appellee shows on the next trial by evidence of a substantial quality that there has been actual resultant damages to the remaining land by reason of the appellant's right of way through appellee's land, the law will award him compensation for the resultant loss. In allowing compensation, however, it cannot allow any compensation on account of any claimed depreciation of such re-

maining land which is due to the mere fears of some of
the people, which are founded in reality upon their lack
of knowledge of the real effect of the line, and which
human experience shows is not justified by the facts.
We have discussed this subject at length, because the
subject is now and will continue to be of great impor-
tance to the people of the state.

(3) 4. It is, of course, the rule that when, in condem-
nation proceedings, the owner of the land asks for a re-
covery for injuries resulting to his remaining land by
reason of the public improvement, the jury shall offset
the value of any benefit that may accrue to the remain-
ing land by reason of the particular public improve-
ment against such damages as may be shown to have re-
sulted to the remaining land by reason of the improve-
ment. The rule upon this subject is fully set out in
*Town of Eutaw v. Botnick,* 150 Ala. 429, 43 South.
739, in which case the reasons for the rule are shown,
and which need not be here repeated.

5. Some of the rulings of the trial court upon the evi-
dence are assigned as error. These questions relate to
the admissibility of certain opinion evidence as to the
value of the remaining land before and after the con-
demnation of the right of way. The above discussion
will probably rid this case upon the next trial of some
of the issues which were presented upon the last trial
and the rules announced in Code 1907, § 3960; and the
cases of *A. G. S. R. R. Co. v. Moody,* 92 Ala. 283, 9
South. 238, *Sou. Ry. Co. v. Morris,* 143 Ala. 631, 42
South. 17, *Ward v. Reynolds,* 32 Ala. 384, *Moss v. State,*
40 South. 341, and *Long Distance Telephone Co.
v. Schmidt,* 157 Ala. 391, 47 South. 731, will fur-
nish a sufficient guide to the trial judge upon the
next trial on the question as to the qualifications which
are necessary for a witness to be able to give his opin-

ion as to the value of the remaining land before and after the condemnation of the right of way.

Undoubtedly the appellee is entitled to recover the value of the easement in the 100-foot strip which has been condemned across its land. It is also undoubtedly entitled to recover the value of the actual depreciation, if any, which has been caused to its remaining lands by reason of the presence of the right of way upon them; but the mere fears of the people of this improvement can in no way be made the basis upon which to predicate such a depreciation, or in any way be permitted to affect the amount of the appellee's recovery.

Reversed and remanded.

McCLELLAN, SAYRE, and GARDNER, JJ., concur.

ON APPLICATION FOR REHEARING.

DE GRAFFENRIED, J.—(4) In the above opinion we called attention to the fact that, in this state, it has, with judicial sanction, been the custom, upon a condemnation proceeding instituted by a railroad company, to allow the owner of the land condemned to the use of the railroad company for the right of way to recover the value of the land condemned for use as a right of way. The reason for this judicial custom obtaining here is given in the above opinion, and is well stated in *Southern Pacifiv Railroad Co. v. San Francisco Savings Union*, 146 Cal. 290, 79 Pac. 961, 70 L. R. A. 221, 106 Am. St. Rep. 36, 2 Ann. Cas. 962. Upon considering this application for rehearing, our attention is called to the case of *Long Distance Telephone & Telegraph Co. v. Schmidt, et al.*, 157 Ala. 391, 47 South. 731. In that case it was held that, where lands are condemned for a right of way, the measure of damages recoverable by

[Alabama Power Company v. Keystone Lime Company.]

the landowner for the lands taken for the right of way is the value of the lands so taken for the right of way when taken. While the conclusion of the court in said case of *Long Distance Telephone Co. v. Schmidt et al., supra,* may be somewhat in conflict with the conclusions reached in *Alabama & Florida Railroad Co. v. Burkett,* 42 Ala. 91, *Odum v. Rutledge & Julian Railroad Co.,* 94 Ala. 494, 10 South. 222, and *Mobile & Ohio Railroad Co. v. Postal Telegraph Cable Co.,* 120 Ala. 21, 24 South. 408, nevertheless, to preserve the harmony, in so far as we can, of our own decisions on the subject in hand, we have determined to follow and reaffirm the opinion of this court in said case of *Long Distance Telephone & Telegraph Co. v. Schmidt, et al., supra,* in so far as the amount which should be awarded to appellee for the lands which were condemned to appellant for its right of way are concerned.

As the Alabama Power Company acquires, by this condemnation proceeding, no mineral rights in the condemned strip, the jury, in estimating the value of the condemned strip, should allow the Keystone Lime Company no compensation for the mineral interests in the land so condemned; but as the power company has acquired the right to use the entire surface of the land condemned, under the authority of *Long Distance Telephone & Telegraph Co. v. Schmidt, et al., supra,* the jury should allow the lime company the value of the strip so condemned, less the value of the mineral interest therein.

In the respect pointed out, and only in that respect, the above opinion is modified.

The application for rehearing is denied.

McCLELLAN, SAYRE, and GARDNER, JJ., concur.