289 S.E.2d 450

**Thurman J. KELL, Frances L. Kell, Ronald J. Kell and Patricia Kell**

v.

**APPALACHIAN POWER COMPANY, a Corporation.**

**No. 15067.**

Supreme Court of Appeals of West Virginia.

March 22, 1982.

Rehearing Denied May 27, 1982.

Lilly & Lilly, Michael H. Lilly, Bluefield, for appellants.

Love, Wise, Robinson & Woodroe, Mario J. Palumbo, Joseph M. Price, Charleston, for appellee.

McHUGH, Justice:

This case is before this Court on an appeal from a final order of the Circuit Court of McDowell County, entered on June 5, 1980, which granted a motion for summary

judgment filed by the Appalachian Power Company (hereinafter the power company) and denied a motion for summary judgment filed by Thurman J. Kell, Frances L. Kell, Ronald J. Kell, and Patricia Kell (hereinafter the Kells). The facts of the case are not in dispute.

The Kells own property in McDowell County, West Virginia, located near Windmill Gap on Flat Top Mountain. In 1939 the Kells' predecessors in interest, Arthur and Mary Hawks, entered into an indenture with the power company by which they granted the power company a right-of-way easement over the property. There is no question as to the validity of that indenture.[1]

The power company constructed a power transmission line across the property in accordance with the rights granted under the 1939 indenture. In 1972 and 1975 the power company sprayed the right-of-way with herbicides to control, retard or kill the vegetation growing on or near the right of way. The herbicides used in that spraying operation were Weedone IBK Woody Plant Herbicide and Amdon 101 Woody Plant Herbicide.[2] The herbicides were applied by

1. The indenture reads, in part, as follows:

 THIS INDENTURE made this 20th day of May, 1939, by and between—Arthur Hawks—and—Mary Hawks, his wife—of the County of McDowell, in the State of West Virginia, parties of the first part and APPALACHIAN ELECTRIC POWER CO., a corporation organized and existing under the laws of the State of Virginia, party of the second part, WITNESSETH

 That for and in consideration of the sum of One and 00/100—Dollars, and other valuable consideration ... said parties of the first part hereby grant ... a right of way and easement with the ... authority to said party of the second part ... to construct, erect, operate and maintain a line or lines for the purpose of transmitting electric or other power and a telephone line or lines, in, on, along, over, through, or across the following described lands ...

 TOGETHER with the right to said party of the second part, its successors and assigns, to place, erect, maintain, inspect, add to the number of, and relocate at will, poles, towers, crossarms or fixtures, and string wires and cables, adding thereto from time to time, across, through or over the above described premises; to cut and at its option, remove from said premises or the premises of the parties of the first part adjoining the same on either side any trees, overhanging branches or other obstructions which may endanger the safety or interfere with the use of said poles and towers or fixtures or wires attached thereto or any structure on said premises; and the right of ingress and egress to and over said above described premises, and any of the adjoining lands of the parties of the first part, at any and all times, for the purpose of patroling the line, or repairing, renewing or adding to the number of said poles, towers, structures, fixtures and wires, and for doing any thing necessary or useful or convenient for the enjoyment of the easement herein granted ....

2. The nature of these herbicides is not in dispute. The active ingredients in Weedone IBK Woody Plant herbicide are the butoxyethanol esters of 2, 4, 5-Trichlorophenoxyacetic acid, commonly known as 2, 4, 5–T, and 2, 4-Dichlorophenoxyacetic acid, commonly known as 2, 4–D. Those two ingredients, when used in equal proportions, are now popularly known as "Agent Orange." *See* n. 7, *infra*. The active ingredients in Amdon 101 Woody Plant Herbicide are the triisopropanolamine salts of 4-Amino-3, 5, 6-Trichloropicolonic acid and 2, 4-Dichlorophenoxyacetic acid. The information sheets concerning those herbicides distributed by the manufacturer, Amchem Products, Inc., contain detailed warnings about some of the dangers posed by their use:

 Harmful if swallowed. Avoid contact with skin, eyes or clothing.

 Do not use around the home, parks or other recreational areas ....

 Do not graze dairy animals on treated areas within 6 weeks after application. Do not slaughter meat animals grazing on treated areas within 2 weeks after application....

 This product is toxic to fish. Keep out of lakes, streams or ponds. Do not contaminate any body of water by washing of spray equipment or disposal of waste. Do not use around the home, in parks or recreation areas....

 Keep out of reach of children. Harmful if swallowed. Causes eye injury. May cause skin irritation. Avoid contact with eyes, skin and clothing. Wash well after handling or use. Keep container closed. Keep away from heat and open flame.

 When handling concentrate wear suitable eye protection. In case of eye contact, promptly flush with plenty of water and get medical attention. Remove contaminated clothing and wash before reuse.

 *Use Precautions.*

 *Do Not Allow Spray Drift*: AMDON 101 is highly active against most broadleafed plants. Tiny amounts may cause injury to such plants if applied during either growing or dormant periods. Do not use high pressure sprays. Do not apply or otherwise permit AMDON 101 or sprays containing it to contact desir-

spray from a Bell G47 series helicopter. This method of applying herbicides is generally known as aerial broadcast spraying. The power company admits that it plans to again spray toxic herbicides on the easement right-of-way granted by the 1939 indenture.

The Kells, by this action, sought to permanently enjoin the power company from using any form of toxic herbicide to clear trees, branches and other obstructions from the right-of-way granted to the power company by the 1939 indenture.[3] Cross-motions for summary judgment were filed in the Circuit Court of McDowell County in May of 1980. The circuit court heard argument on the cross-motions on May 23, 1980. On June 5, 1980, the circuit court entered an order finding that there was no genuine issue of material fact and that the power company was entitled to summary judgment as a matter of law. This appeal followed. It is conceded by all parties to this action that there is no genuine issue as to any material fact in the case.

Many cases can be found from other jurisdictions involving the aerial application of toxic herbicides and other poisons. These cases, however, usually involve questions of negligence,[4] nuisance,[5] trespass,[6] or strict liability.[7] The case now before us presents a novel issue. That issue may be framed as follows: Is a power company authorized to spray toxic herbicides from an aircraft over its right-of-way under language in an indenture which provides:

[P]arties of the first part hereby grant ... to the party of the second part ... a right of way and easement with the right, privilege and authority to said party of the second part ... to construct, erect, operate and maintain a line or lines for the purpose of transmitting electric or other power ... in, on, along, over, through, or across the ... described lands.... TOGETHER with the right of the said party of the second part ... to cut and at its option, remove from said premises ... any trees, overhanging branches or other obstructions which may endanger the safety or interfere with the use of said poles and towers or fixtures or wires ... on said premises....

In order to answer this question we find it necessary to consider the general rights of parties to easement agreements such as the 1939 indenture, the general rules of construction applied to such indentures, and the nature of the activity here involved.

 Generally, a power company which is granted a right-of-way easement over land for the purpose of constructing and maintaining a power transmission line does not acquire a fee interest in the land.[8]

---

able plants such as flowers, other ornamentals, vegetables, grapes, fruit trees, cotton, tobacco, tomatoes, potatoes, beans of all types including soybeans, and other valuable plants. Apply AMDON 101 only when there is little or no wind and no hazard from drift. Coarse sprays are least likely to drift.

*Do Not Contaminate Water*. To avoid injury to crops or other desirable plants, do not treat or allow spray drift to fall into inner banks or bottom of irrigation ditches.

COMBUSTIBLE LIQUID.

3. The Kells' amended complaint also asked for $15,000.00 in damages based upon a January 17, 1939, agreement between their predecessors in interest, the Hawks, and the power company. It was alleged that by that agreement the power company granted a free energy supply to the grantor-owners. That agreement does not appear in the record nor is it discussed or referred to in any part of the record other than the Kells' amended complaint. We, therefore, do not consider this claim to be properly before the Court.

4. *See, e.g., Kentucky Aerospray v. Mays*, 251 S.W.2d 460 (Ky.1952); *Faire v. Burke*, 363 Mo. 562, 252 S.W.2d 289 (1952); *Wieting v. Ball Air Spray, Inc.*, 84 S.D. 493, 173 N.W.2d 272 (1969) and cases collected at 37 A.L.R.3d 833 (1971).

5. *See, e.g., Miles v. A. Arena & Co.*, 23 Cal.App.2d 680, 73 P.2d 1260 (1937); *Gainey v. Folkman*, 114 F.Supp. 231 (D.Ariz.1953).

6. *See, e.g., Loe v. Lenhardt, infra; Cross v. Harris*, 230 Or. 398, 370 P.2d 703 (1962).

7. *See, e.g., Gotreaux v. Gary*, 232 La. 373, 94 So.2d 293 (1957); *Young v. Darter*, 363 P.2d 829 (Okl.1961).

8. *See, e.g., De Penning v. Iowa Power & Light Co.*, 239 Iowa 950, 33 N.W.2d 503 (1948); *Shedd v. Northern Indiana Public Service Co.*, 206 Ind. 35, 188 N.E. 322 (1934); *Patterson Orchard Co. v. Southwest Arkansas Utilities Corp.*, 179 Ark. 1029, 18 S.W.2d 1028 (1929); *Dickel v. Bucks-Falls Electric Co.*, 306 Pa. 504, 160 A. 115 (1932).

Nor does the power company have a right to exclusive possession of the right-of-way conveyed.[9] In *Patterson Orchard Co.*, n. 9, *supra*, it was held that a power company had a right only to possess the property to the extent necessary for the purpose of the grant. Similarly, the court in *Hartford Electric Light Co.*, n. 9, *supra*, held that a power company had no right to occupy the land except for that space actually occupied by the equipment located thereon.

The fee interest in land over which a power company has been granted an easement remains in the party making the grant.[10] The grantor-owner of the land retains the right to make any reasonable use of the land subject to the easement so long as that use is not inconsistent with the rights of the grantee.[11]

In *Texas Public Utilities Co. v. Bass*, 297 S.W. 301 (Tex.Civ.App.1927), it was held that the grantor-owner had the right to use the land in any manner which did not interfere with the power company's operation of its equipment. Such permissive uses by the grantor-owner of the land subject to the easement have been held to include cultivation of the land, the right to pass along and across the land, the taking of minerals from the land and the construction of driveways or parking lots on the land.[12]

A power company, however, does have the right, under a general right-of-way easement, to enter upon the land to maintain and repair its equipment to the extent necessary to the safe and effective operation of that equipment.[13] A power company, however, in exercising that right of entry, may not inflict unnecessary damage on the land. *Otter Tail Power Co.*, n. 13, *supra*. Similarly, it has been held that a power company, in exercising its right to enter upon the land to maintain or repair its equipment, may not unreasonably increase the burden placed upon the servient tenement. *Martin v. Norris Public Power Dist.*, 175 Neb. 815, 124 N.W.2d 221 (1963). It was decided very early that this right of entry included the right to enter upon the land to cut or trim trees or limbs which might be a danger to the power lines.[14]

In the case presently before us the power company clearly has the right under the common law principles discussed above, and under the 1939 indenture, to enter upon the Kells' land to cut and remove trees, overhanging branches or other obstructions which pose a danger to, or interfere with the effective operation of, the power company's equipment located upon that land. The power company's rights are not, however, unlimited. The power company must not inflict unnecessary damage to the land nor may its exercise of its rights unreasonably increase the burden placed on the servient tenement. Problems arise from the aerial broadcast spraying of

9. See, e.g., Patterson Orchard Co., supra; Draker v. Iowa Electric Co., 191 Iowa 1376, 182 N.W. 896 (1921); Alabama Power Co. v. Keystone Lime Co., 191 Ala. 58, 67 So. 833 (1914); Kentucky & West Virginia Power Co. v. Elkhorn City Land Co., 212 Ky. 624, 279 S.W. 1082 (1926); Hartford Electric Light Co. v. Wethersfield, 165 Conn. 211, 332 A.2d 83 (1973).

10. See, e.g., Nantahala Power and Light Co. v. Carringer, 220 N.C. 57, 16 S.E.2d 453 (1941); Georgia Utilities Co. v. Ward, 37 Ga.App. 45, 138 S.E. 588 (1927).

11. See, e.g., Horky v. Kentucky Utilities Co., 336 S.W.2d 588 (Ky.1960); In re Omaha Public Power Dist., 168 Neb. 120, 95 N.W.2d 209 (1959); Los Angeles v. Igna, 208 Cal.App.2d 338, 25 Cal. Rptr. 247 (1962); Alabama Power Co. v. Berry, 222 Ala. 20, 130 So. 541 (1930); Aycock v. Houston Lighting & Power Co., 175 S.W.2d 710 (Tex. Civ.App.1943); Shedd, n. 8, supra.

12. See Los Angeles v. Ingersoll-Rand Co., 57 Cal. App.3d 889, 129 Cal.Rptr. 485 (1976); Public Service Co. v. Home Builders Assoc. of Realtors, Inc., 554 P.2d 1181 (Okl.1976); Alabama Power Co. v. Scott, 21 Ala.App. 27, 104 So. 873 (1925); Collins v. Alabama Power Co., 214 Ala. 643, 108 So. 868 (1926); Alabama Power Co. v. Keystone Lime Co., supra; Kentucky & West Virginia Power Co. v. May, 245 Ky. 333, 53 S.W.2d 696 (1932).

13. See, e.g., Moore v. Indiana & Michigan Electric Co., 229 Ind. 309, 95 N.E.2d 210 (1951); Otter Tail Power Co. v. Malme, 92 N.W.2d 514 (N.D.1958); Vermont Electric Power Co. v. Anderson, 121 Vt. 72, 147 A.2d 875 (1959).

14. See Alabama Power Co. v. Berry, supra; Yadkin River Power Co. v. Wissler, 160 N.C. 269, 76 S.E. 267 (1912).

toxic herbicides due to the nature of the chemicals used in the process and the manner of their application.

When aircraft are used to apply herbicides a wide swath of land is necessarily included in the area covered by the application. The problem of the wide dispersion of the chemical sprayed is further exacerbated by a phenonenon known as "drift."

Drift is a phenomenon which occurs when air is the medium through which the pesticide is applied to the target area; it causes the pesticide to come into contact with areas outside the target. Drift is a function of various factors: the chemical nature of the pesticide, the physical state in which it is applied, the method of application, the volatility of the substance, and atmospheric conditions.

Kennedy, *Liability in the Aerial Application of Pesticides*, 22 S.D.L.Rev. 75, 76 (1977). There is at least one case in which pesticides applied by aircraft drifted as far as 100 miles from the area in which they were applied.[15] Fumes created from aerial broadcast spraying of toxic herbicides, including 2–4–D, can linger over the area sprayed for two to three days after their application. *See Binder v. Perkins*, 213 Kan. 365, 516 P.2d 1012 (1973). The phenomenon of drift is largely responsible for most law suits that involve the aerial application of herbicides and other pesticides. *Kennedy, supra,* at 76, note 5.[16]

The nature of the poisons used in these aerial spray operations also pose significant problems. Weedone IBK, for example, kills a broad range of weeds and broadleafed trees such as elder, ash, box elder, buckbrush, elderberry, elm, honeysuckle, chestnut, wild grape, sumac, wild cherry, pine, poplar and others. The poison, however, also kills cotton, beans, tomatoes and ornamentals. Amchem, Inc. warns that Weedone IBK is toxic to fish and may contaminate water sources. Amdon 101

15. Kennedy, *supra*, at 78, citing United States Department of Health Education & Welfare, *Report of the Secretary's Commission on Pesticides and Their Relationship to Environmental Health* 132 (1969).

16. The power company has recognized that the aerial broadcast spraying of herbicides may pose serious problems and dangers and has issued "Instructions and Specifications for Helicopter Spraying" which read, in part, as follows:

*Weather:*

a. Wind—All herbicide will be applied when wind velocities are less than five (5) miles per hour.

b. Fog—*Never* spray in a fog or when there is danger of getting spray in a fog bank.

c. Rain—*Never* spray in rain or when it seems apparent that it will rain within the next 30–45 minutes. After a rain, spraying can continue after the water has run off the leaves sufficiently to insure that run-off (from the leaf surface) of the sprayed material will not be excessive. Check with Inspector.

. . . .

10. Known restrictions will be furnished to you prior to spraying operations. Familiarize yourself with these and identify them on the ground by reconnaissance.

11. Do not spray any water.

12. Do not spray any discernible pasture lands presently being grazed. . . .

14. Do not spray humans or animals. . . .

16. Avoid flying over structures occupied by people, animals, and or fowl whenever possible. . . .

19. Restrict your spray activity to a reasonable safe distance from habitable structures, gardens, orchards, crops, water, and animals. Use judgment, based on ability, materials, and equipment being used.

20. Report all inquiries relative to spray activities to the owner's representative and take positive action to see that they are handled promptly. Fill out the supplied Investigation Form indicating action taken. This should be prepared with a contact until satisfactorily concluded. . . .

23. An attempt has been made to mark all overhead line crossings. Pilots should not fully rely on this method, but should take the necessary safety precautions. It is recommended that the practice of spraying away from overhead line crossings should be adopted where practical.

We note that this document evidences an awareness on the part of the power company of the danger involved in aerial broadcast spraying. We do not, however, find their instructions and specifications reassuring on the question of the safety of the process. It is little comfort to know that only "discernible" pasture lands will be avoided, that in the opinion of the power company only close rains will not cause run off, that in the opinion of the power company only five miles or more per hour wind velocities will cause drift, that human residences will be avoided "whenever possible," that the pilot will judge whether his distance from structures and cultivated areas is safe, and that "an attempt" has been made to mark the targets.

kills an even wider variety of weeds and trees than does Weedone IBK. Amdon 101 will also kill such things as flowers, ornamentals, vegetables, grapes, fruit trees, cotton, tobacco, tomatoes, potatoes and beans of all sorts. *See* n. 2, *supra.*

Toxic herbicides such as those involved in this case are dangerous poisons. This has been recognized in the Federal Environmental Pesticide Control Act of 1972, 7 *U.S.C.* § 136 *et seq.*, and the West Virginia Pesticide Use and Application Act, *W. Va. Code*, 19–16B–1 [1975], *et seq. W. Va. Code*, 19–16B–2 [1975], states, in the way of legislative findings, as follows:

> Pesticides ... may cause injury to man or may cause unreasonable adverse effects on the environment if not properly used. They may injure man or animals either by direct poisoning or by the gradual accumulation of pesticide residues in their tissues. Crops or other plants may be affected by their improper use. The drifting or washing of pesticides into streams or lakes may cause appreciable damage to aquatic life. And, a pesticide applied for the purpose of killing pests in a crop, which is not itself injured by the pesticide may drift and injure other crops or nontarget organisms with which it comes in contact.

The Fifth Circuit has called the aerial broadcast spraying of herbicides inherently dangerous. *Emelwon v. United States,* 391 F.2d 9 (5th Cir.), *cert. denied,* 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111 (1968). The aerial broadcast spraying of toxic herbicides was found to be an extra hazardous activity in *Loe v. Lenhardt,* 227 Or. 242, 362 P.2d 312 (1961). One court character-

ized 2, 4–D as "a dangerous instrumentality" and the handling of it "a hazardous activity." *Binder v. Perkins, supra,* 516 P.2d at 1016.[17]

In any construction of the language of a deed the intent of the parties is controlling.[18] The use of aerial broadcast spraying of herbicides to control vegetation along a right-of-way was unknown in 1939 and could not have been within the specific contemplation of the parties to the 1939 indenture involved in this case. The general parameters of the intent of the parties to that indenture, however, are discernible. It was not within the intent of the parties to an agreement such as the 1939 indenture to say that any broader rights were granted than were reasonably necessary to effectuate the purpose of the agreement. The right granted is tempered by the purpose to be served by that right. That specific purpose, in the case before us, was to allow the power company to cut and remove trees or limbs that endangered or hindered their equipment. It was clearly not the intention of the parties to allow the power company to destroy all living vegetation within the area sprayed or adjoining areas where these deadly herbicides could drift. Such action is not necessary to the protection of the power company's equipment. Aerial broadcast spraying destroys the vegetation indiscriminately, whether it poses a danger or hindrance to the power company's equipment or not. Nor can it be said that the parties intended, by the grant in the 1939 indenture to repeatedly expose themselves to hazardous activities and chemical agents.[19]

---

**17.** On March 1, 1970, the United States Environmental Protection Agency (E.P.A.) cancelled all 2, 4, 5–T uses on food crops intended for human consumption. The United States Department of Agriculture, on September 28, 1970, advised that 2, 4, 5–T constituted a hazard to people. On April 15, 1970, the Surgeon General of the United States issued an opinion that 2, 4, 5–T is a hazard to health. The National Research Council Committee of the National Academy of Sciences has warned that 2, 4, 5–T has a significant potential for causing birth defects. *See generally,* E.P.A., *Legal Compilation: "Pesticides"* (1973); Yannacone, et al., *Dioxin: Molecule of Death,* 17 Trial 30 (Dec.1981).

**18.** *See, e.g., Laux v. Freed,* 53 Cal.2d 512, 2 Cal.Rptr. 265, 348 P.2d 873 (1960); *Sachs v. Toquet,* 121 Conn. 60, 183 A. 22 (1936); *Diller v. St. Louis, Springfield and Peoria Railroad,* 304 Ill. 373, 136 N.E. 703 (1922); *Doody v. Spurr,* 315 Mass. 129, 51 N.E.2d 981 (1943).

**19.** We here note that, at the time the easement was granted in 1939, the dwelling of the Hawks was only 40 feet from the right-of-way granted to the power company. The current location of the Kells' home does not appear in the record.

The power company correctly notes that a grantee of an easement normally can take advantage of technological improvements in utilizing his easement. *Davis v. Jefferson County Telephone Co.*, 82 W.Va. 357, 95 S.E. 1042 (1918). This, however, is not a right in a vacuum. The rights of parties in cases involving power line easements are relative. *See Westphal v. Kentucky Utilities Co.*, 343 S.W.2d 367 (Ky. 1961). The power company's right to use technological innovations must be weighed against the right of the grantor-owner to possess and use the adjacent land and the land underlying the power lines. The use of aerial broadcast spraying of herbicides impermissibly interferes with the grantor-owner's rights and interests. For example, the grantor-owner's right to cultivate the land could be nullified by the use of the herbicides. The power company cannot indiscriminately wreak havoc upon the owner's land and its appurtenances in order to exercise its limited right to protect its lines from danger and hindrance from overhanging branches and trees. The use of aerial broadcast spraying of toxic herbicides inflicts unnecessary damage on the land. It is not necessary to the maintenance or protection of the power company's equipment to wantonly destroy everything growing in the proximity of its lines regardless of whether the matter destroyed poses a danger to the power company's equipment.

We find that the case of *Stirling v. Dixie Electric Membership Corp.*, 344 So.2d 427 (La.App.1977), supports the Kells' position in this case. In that case the plaintiffs sued the power company for damage done to trees, plants and shrubs that resulted from the aerial spraying of herbicides over the power company's right-of-way across the plaintiffs' property. The power company argued that it had a right to so spray under a servitude similar to the indenture in the case before us. The trial court in *Stirling* agreed with the power company. In reversing, the appellate court said:

The application of the chemical was indiscriminate, without regard to the height or proximity of any plant, tree or shrub to the line. Any and all vegetation within and along the thirty foot path got the full treatment.... We do not believe that the use of a chemical here was permissible under the circumstances. The vast majority of trees and shrubs were not a threat to the electrical lines....

Generally, a grantor is permitted to plant decorative shrubs along a servitude of this nature and to enjoy the use of the land within the right of way so long as it does not obstruct the purpose for which the servitude was granted. If in the course of maintaining the lines it becomes necessary to remove, 'cut and trim trees and shrubs', it must be in a reasonable manner, with due regard to the rights of all the parties. This we find to be the intent of the servitude agreement. The agreement did not call for the periodic wholesale destruction of every parcel of vegetation.

*Id.* 344 So.2d at 429. *See also Grimm v. Cooperative Electric Power and Light Co.*, 176 Kan. 630, 272 P.2d 1052 (1954).

The power company does not have the right under the 1939 indenture to destroy vegetation that does not endanger or hinder its equipment. We, therefore, hold that language in an indenture which gives a power company the right to cut and remove trees, overhanging branches or other obstructions that endanger the safety, or interfere with the use, of the power company's lines on the right-of-way granted by the indenture does not authorize the power company to apply toxic herbicides to that right-of-way by aerial broadcast spraying.

The order of the Circuit Court of McDowell County, entered on June 5, 1980, is therefore reversed and the case is remanded to that court with instructions that the injunction prayed for by the appellants, Thurman J. Kell, Frances L. Kell, Ronald J. Kell and Patricia Kell be granted.

Reversed and remanded with instructions.