27 F.3d 104
 C/R TV, INCORPORATED, Plaintiff-Appellant,
v.
SHANNONDALE, INCORPORATED; Michael M. Johnson;
Mid-Atlantic Cable Limited Partnership of
Jefferson County; Mid-Atlantic Cable
Services Company, Defendants-Appellees.
 No. 93-2039.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 10, 1994.
Decided June 21, 1994.
 
 ARGUED: Robert Gerald Scott, Jr., Cole, Raywid & Braverman, Washington, DC, for appellant. Mark J. Tauber, Piper & Marbury, Baltimore, MD, for appellees.
 ON BRIEF: John David Seiver, Paul Glist, Cole, Raywid & Braverman, Washington, DC, for appellant. Nora E. Garrote, Mary E. Gately, Piper & Marbury, Baltimore, MD, for appellees.
 Before ERVIN, Chief Judge, and WILKINS and NIEMEYER, Circuit Judges.
 Reversed by published opinion. Judge NIEMEYER wrote the opinion, in which Chief Judge ERVIN and Judge WILKINS joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 C/R TV Cable, Inc. seeks a right of access to the Shannondale subdivision, a private residential community in Jefferson County, West Virginia, to provide cable television service to the subdivision over the objection of its developer. Relying on three separate legal theories, it contends that (1) as a licensee of three 1955 utility easements allowing attachment of "telephone wires" to existing utility poles, it may attach cable-television wires; (2) it is entitled to access to utility easements over private property, even without the consent of the property owner, under the Cable Communication Policy Act of 1984, 47 U.S.C. Sec. 541(a)(2); and (3) it is entitled to access under the West Virginia Cable Television Systems Act, W.Va.Code Sec. 5-18-1 et seq. Rejecting all three of C/R TV's contentions for general access to the subdivision, and allowing access to only a portion covered by a separate 1991 utility easement (a ruling not challenged on appeal), the district court entered summary judgment in favor of the subdivision developer and a competitor cable company, which was given the exclusive right to provide cable service to the subdivision by the developer, 792 F.Supp. 1018.
 
 
 2
 Because we conclude that the 1955 easements, construed under applicable West Virginia law, are sufficiently broad to include the right to string cable-television wires, we reverse.
 
 
 3
 * The Shannondale subdivision, near Charles Town in Jefferson County, West Virginia, was first developed in the 1950's by Shannondale, Inc., a West Virginia corporation. The subdivision consists of over 4,000 acres, a portion of which is divided into 5,000 individual lots for single-family homes. All but 120 lots have been sold to individuals, and currently 909 homes have been built in the subdivision.
 
 
 4
 In the deed to each lot sold, Shannondale reserved a right-of-way for general utility use, with the following language:
 
 
 5
 Seller [Shannondale, Inc.] reserves a right of way with right of entry upon, over, across and through said lot for purposes of constructing, operating, maintaining and repairing, pole lines for electrical and telephone services, and other utilities, reserving to the Seller the sole right to convey the rights hereby reserved.
 
 
 6
 Shannondale also retained ownership of all 55 miles of private roads in the subdivision, although it conveyed title to three roads (a total of five miles) to the West Virginia Department of Highways in 1980.
 
 
 7
 In 1955, Shannondale granted three utility easements to the Potomac Light & Power Company, which later became Potomac Edison Company of West Virginia ("Potomac Edison"), to install poles and string wires for electrical and telephone service to each of the lots in the Shannondale subdivision. The easements, which are recorded on the land records, are located along the roads in the subdivision and along rear and side lot lines, and permit:
 
 
 8
 the installation, erection, maintenance, repair and operation of electric transmission and distribution pole lines, and electric service lines, with telephone wires thereon.
 
 
 9
 In connection with a different geographical area in the Shannondale subdivision, Shannondale granted an additional easement to Potomac Edison in 1991 which provided a right-of-way
 
 
 10
 for the purpose of constructing, reconstructing, inspecting, operating and maintaining an overhead and/or underground electric and communications system ... and to permit the installation of wires, cables, conduit or other facilities of any Company or persons.
 
 
 11
 Other than the 1955 and 1991 easements given to Potomac Edison, there are no recorded easements within the Shannondale subdivision to any telephone company or other utility.
 
 
 12
 Over the years, Potomac Edison has licensed the use of its poles, both in the Shannondale subdivision and elsewhere in Jefferson County, to various utilities on a nonexclusive basis. In 1960, it authorized GTE South, Inc., a telephone company, to string telephone wires on its poles. In 1972, it authorized C/R TV to string television cables on its poles, and in 1992, it authorized Mid-Atlantic Cable Limited Partnership of Jefferson County ("Mid-Atlantic Cable"), a competing cable company, to string television cables on its poles. All of Potomac Edison's poles in the Shannondale subdivision are located on the property of Shannondale, Inc., or within utility easements reserved by Shannondale.
 
 
 13
 After West Virginia enacted the West Virginia Cable Television Systems Act in 1990, C/R TV obtained a franchise, as required by the act, from Jefferson County. The franchise was issued for 15 years on a nonexclusive basis. Similarly, Mid-Atlantic Cable obtained a 15-year, nonexclusive franchise from Jefferson County.
 
 
 14
 After C/R TV installed cable in an area north of the Shannondale subdivision, it expanded service southward, and in December 1991 and January 1992, it installed cable on the Potomac Edison poles located in the Shannondale subdivision. Through the first week of January 1992, C/R TV had installed approximately six and one-half miles of cable in the Shannondale subdivision. On January 8, 1992, Michael M. Johnson, the president of Shannondale, noticed C/R TV construction workers installing cable and questioned their authority to do so. Johnson then called C/R TV's operations manager and told him that Johnson owned the roads in the Shannondale subdivision and that only Mid-Atlantic Cable had an agreement with Shannondale for the installation of cable television system within the subdivision. Johnson warned C/R TV not to send any more construction crews into the subdivision. The next day, Shannondale's attorney wrote a letter to C/R TV advising it that any C/R TV representatives seen on the nonpublic roads of Shannondale "will be considered trespassers and will be fully prosecuted."
 
 
 15
 Seeking to enforce a right of access to the Shannondale subdivision under the easements granted to Potomac Edison and under the Cable Communication Policy Act and the West Virginia Television Cable Systems Act, C/R TV filed suit against Shannondale, Inc., its president Michael M. Johnson, Mid-Atlantic Cable, and its general partner Mid-Atlantic Cable Services Company in the district court, seeking an injunction and a declaration of rights.
 
 
 16
 On cross-motions for summary judgment, the magistrate judge, to whom the motions had been referred by the district judge, concluded that the easements granted to Potomac Edison in 1955 were not "sufficiently broad to provide for television cable facilities," but that the broader language of the 1991 easement granted to Potomac Edison for a limited area of the Shannondale subdivision would permit C/R TV to string its cable wires in that portion of the Shannondale subdivision.
 
 
 17
 On the claim that the Cable Communication Policy Act authorized access through the general utility easements held by Shannondale, the magistrate judge, relying on our decision in Media General Cable of Fairfax, Inc. v. Sequoyah Condominium Council of Co-Owners, 991 F.2d 1169 (4th Cir.1993), concluded that the Act did not give C/R TV the right to use the utility easements over Shannondale's objection.
 
 
 18
 Finally, on the question of whether C/R TV had a right of access under the West Virginia Television Cable Systems Act, the magistrate judge concluded that the statutory language authorizing franchised cable companies to construct and operate a cable system "above, below, on, in or along any highway or other public place and through easements which have been dedicated for compatible purposes," W.Va.Code Sec. 5-18-12(a) (emphasis added), entitled C/R TV to string cable on poles along public roads, even if the poles were on private property. Finding, however, that such authorization would effect a taking of property without just compensation, the magistrate judge concluded that the Act in this respect violated the Takings Clause of the Fifth Amendment to the United States Constitution.
 
 
 19
 In short, the magistrate judge authorized C/R TV access to Potomac Edison's poles in the limited area covered by the 1991 easement and denied it access for all other areas. The district court accepted the magistrate judge's findings and recommendation "without exception or reservation" and entered judgment accordingly. 792 F.Supp. 1018.
 
 
 20
 This appeal followed.
 
 II
 
 21
 C/R TV argues that the 1955 easements granted by Shannondale to Potomac Edison for the purpose of "installation, erection, maintenance, repair and operation of electric transmission and distribution pole lines, and electric service lines, with telephone lines thereon," when interpreted under applicable West Virginia law, are sufficiently broad to include a right to string cables that transmit television signals. Shannondale and Mid-Atlantic Cable contend that television cable is neither an electric service line nor a telephone wire within the meaning of the easement and, therefore, C/R TV has no right to string its cables under the 1955 easements. The question thus presented is whether an easement to construct poles and to string electrical power and telephone wires on the poles includes the right to string television transmission cables. To resolve the issue, we must first turn to the principles of West Virginia common law governing the interpretation of easements.
 
 
 22
 An easement involves two separate interests in real property, the dominant estate to which the easement right belongs, and the servient estate upon which the obligation rests. See Cottrell v. Nurnberger, 131 W.Va. 391, 396-97, 47 S.E.2d 454, 457 (1948). The term easement usually refers to the right enjoyed by the dominant estate, and a servitude is the correlative burden imposed upon the servient estate. Id. The easement may be created by an express or implied grant which, because it creates an interest in land, must satisfy the statute of frauds and ordinarily be evidenced by a writing. Under an affirmative easement, as is involved in this case, the owner of the servient estate must permit "something to be done upon [the land]" or "some use to be made of it." Id.
 
 
 23
 Questions about the scope of the grant can often be answered by determining the extent to which the proposed use of the easement increases the burden on the servient estate over acknowledged uses. Thus, where an electric power company was granted an easement in 1939 to erect poles and power lines and to maintain the facilities by cutting and removing trees and other obstructions, the court looked to the burden on the servient estate to determine whether the right to cut and to remove trees included the right to spray herbicides on the easement from aircraft. See Kell v. Appalachian Power Co., 170 W.Va. 14, 289 S.E.2d 450 (1982).
 
 
 24
 Although the court in Kell recognized that the power company could normally "take advantage of technological improvements in utilizing the easement," 289 S.E.2d at 456, it held that aerial spraying was nevertheless beyond the original easement's scope because of the phenomenon known as "drift," where aerially sprayed herbicides fall beyond the areas targeted and therefore kill foliage outside the area covered by the easement. While the easement granted the power company a right to remove interfering vegetation, the court stated, "It was clearly not the intention of the parties to allow the power company to destroy all living vegetation within the area sprayed or adjoining areas where these deadly herbicides could drift." Id. at 19, 289 S.E.2d at 456. In reaching this conclusion, the court focused on whether the argued-for utilization of the easement increased the burden on the servient estate:
 
 
 25
 The power company must not inflict unnecessary damage to the land nor may its exercise of its rights unreasonably increase the burden placed on the servient tenement.
 
 
 26
 Id. at 17, 289 S.E.2d at 454.
 
 
 27
 The parties to this case agree that the West Virginia cases construe easements to give the easement holder a right "reasonably necessary" to carry out the purpose of the grant, including the right to utilize technological improvements. See, e.g., Kell, 170 W.Va. at 19, 289 S.E.2d at 456. Determining the limitations on the application of these principles, however, the court in Buffalo Min. Co. v. Martin, 165 W.Va. 10, 267 S.E.2d 721 (1980), marked the boundaries based on a proposed use's compatibility with the purpose of the grant and the absence of any substantial increase in burden on the servient estate. The court held that an easement granted to extract minerals and, for that purpose, to erect buildings, machinery and other necessary equipment, including telephone and telegraph lines (but not electric lines), included by implication the right to erect electric lines. In so holding, the court articulated the following rule of construction:
 
 
 28
 The fundamental basis for all of the decisions is whether the easement sought is substantially compatible with the surface rights granted to the mineral owner and whether it substantially burdens the surface owner's estate.
 
 
 29
 Id. at 15, 267 S.E.2d at 724 n. 3 (emphasis added). The test announced in Buffalo Mining thus requires us to inquire into: (1) whether the use sought to be included within an easement grant is substantially compatible with the explicit grant, and (2) whether it substantially burdens the servient estate.
 
 
 30
 In the case before us, the 1955 easements gave Potomac Edison the right to erect poles and to string electric power lines and telephone wires on them. Under the acknowledged right granted by the easement, Potomac Edison licensed GTE to install telephone wires for distribution of telephone service to Shannondale residents. At the time of the grant, these wires consisted of a narrow-band, voice-service twisted pair of copper wires. But with technological advances over the years, improved wires were strung under the easements granted to Potomac Edison, including fiber-optic cables. GTE's fiber-optic cables, which Shannondale concedes are permitted by that doctrine which entitles a grantee to utilize technological advances, carry signals that provide voice, computer data, telecopying, and visual transmissions. At oral argument, counsel for Shannondale agreed that GTE could properly transmit all forms of electronic and fiber-optic signals. Because GTE is a telephone company, Shannondale argues, its cable may be labeled as "telephone wire" as used in the 1955 easements.
 
 
 31
 Shannondale's call for a strict interpretation of the easement language against C/R TV, however, cannot be reconciled with its common-sense interpretation and application of the easements over the years. A strict interpretation would limit the use of the telephone wire language of the easement to wires devoted solely to audio transmission. See definition of "telephone", Random House Dictionary, 2nd Ed. (Unabridged) (1987) ("an apparatus, system, or process for transmission of sound or speech to a distant point, esp. by an electric device") (emphasis added); Webster's Third New International Dictionary (1961) ("an instrument for reproducing sounds, esp. articulate speech at a distance") (emphasis added). Indeed, differences in the roots of the words telephone (phone meaning sound) and television (vision meaning sight) form the basis for the distinctions in definition, the former referring to an instrument dedicated to the transmission of remote sound and the latter to the transmission of remote visual images. Yet, Shannondale concedes that GTE has been transmitting data and video images for computers, in addition to sound signals, over wires installed under the easement, and that GTE has been authorized to do so. Shannondale claims that it allows this amplification of the term "telephone wire" because the technological advancement is utilized by a telephone company in providing a more technologically advanced telephone system. By force of the principle derived from these same circumstances, fiber-optic cables are also permitted as "telephone wires."
 
 
 32
 Shannondale's acquiescence in the expansion of the easement term "telephone wire" to include a fiber-optic cable that transmits video and data signals is consistent with the rule recognized by the West Virginia courts which interprets easements to accommodate technological advancements. See Kell, 170 W.Va. at 19, 289 S.E.2d at 456; Buffalo Mining, 165 W.Va. at 15, 267 S.E.2d at 724, n. 3. Once Shannondale makes the concession that the 1955 easements are properly used by GTE to string fiber-optic cables for transmission of phonic, video, and data signals, however, it cannot, under application of any rational principle, deny C/R TV the right to use the easement for the same transmission of video and sound when both GTE and C/R TV have the same license from Potomac Edison under the easement.
 
 
 33
 The fact that an additional wire would be introduced to the many others on the poles does not impose any meaningful increase of burden on Shannondale's interest in the underlying property. As now installed, the Potomac Edison telephone poles are strung with numerous power lines and several "telephone wires" or cables substantially larger in size than the TV transmission cable that C/R TV seeks to install. Indeed, before the court below, Michael Johnson, the president of Shannondale, conceded that the mere fact that there would be an additional wire, such as that proposed for installation by C/R TV, "is not a concern." Moreover, the electrical signals themselves provide no basis for distinction for purposes of measuring the increased burden on the servient estate. Any possible difference would be impalpable and would not impose an additional burden on the servient estate.
 
 
 34
 Two arguments are advanced by Shannondale and Mid-Atlantic Cable to distinguish C/R TV's circumstances from those of GTE. First, they argue that GTE is a telephone company providing telephone services, whereas C/R TV is a television signal transmission company. And, second, Shannondale argues that it gave exclusive rights to distribute television signals to Mid-Atlantic Cable under an arrangement in which Shannondale would share in the profits. Neither factor, however, is relevant to the proper interpretation of the 1955 easement rights which C/R TV seeks to utilize.
 
 
 35
 The fact that C/R TV is not a telephone company is not material to the easement grant. The transmissions of a telephone company are virtually indistinguishable from transmissions of a non-telephone company transmitting television signals for purposes of a pole and wire easement grant. Moreover, the original easements to erect poles and wires were given only to an electric power company, and Shannondale has never granted a direct right to a telephone company to erect communication wires of any kind.
 
 
 36
 That Shannondale purported to give Mid-Atlantic Cable exclusive rights to provide cable television service to the subdivision cannot adversely affect rights that C/R TV had previously obtained where, as here, (1) those rights were given earlier by Shannondale to Potomac Edison and (2) neither Potomac Edison nor C/R TV were parties to Shannondale's contract with Mid-Atlantic Cable.
 
 
 37
 In summary, applying the test announced in Buffalo Mining, we conclude that (1) the use of a wire for the transmission of television signals is substantially compatible with the use given for the transmission of telephonic data and visual signals now enjoyed by GTE, and (2) the addition of a television transmission wire, indistinguishable in appearance from other communication wires authorized under the grant, does not impose an unnecessary or even an increased burden on the servient estate. Accordingly, we hold that the 1955 easements granted by Shannondale to Potomac Edison are sufficiently broad to permit Potomac Edison, and hence C/R TV, to string television transmission wires and cables on its poles.
 
 
 38
 Having reached this conclusion under the 1955 easements, we need not reach the question of whether the Cable Communication Policy Act or the West Virginia Television Cable Systems Act authorize the use of Shannondale's utility easements over Shannondalen's objection.
 
 
 39
 REVERSED.