[Cite as *Corder v. Ohio Edison, Co.*, 2019-Ohio-2639.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
HARRISON COUNTY

CRAIG D. CORDER ET AL.,

Plaintiffs-Appellants,

v.

OHIO EDISON COMPANY,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 HA 0002**

---

Civil Appeal from the
Court of Common Pleas of Harrison County, Ohio
Case No. CVH-2017-0057

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. Charles Kidder*, Kidder Law Firm, LLC., 6375 Riverside Drive, Suite 220, Dublin, Ohio 43017, for Plaintiffs-Appellants and

*Atty. Denise Hasbrook,* Roetzel & Andress, LPA, One SeaGate, Suite 1700, Toledo, Ohio, 43604, for Defendant-Appellee.

Dated:  June, 19, 2019

---

**D'APOLITO, J.**

**{¶1}**    Appellants, Craig D. Corder, Jackie C. Corder, and Scott Corder appeal the judgment entry of the Harrison County Court of Common Pleas finding sua sponte that the Public Utilities Commission of Ohio ("PUCO") has exclusive jurisdiction over the issue raised in this action for declaratory judgment and injunctive relief.  Appellants contend that the plain language of three 1948 easements, which traverse a portion of their property, prohibits Appellee, Ohio Edison from applying herbicide to control vegetation growth.  Appellee counters that resolution of vegetation control issues requires PUCO's administrative expertise, and herbicide application constitutes a practice normally authorized by the utility.  Because the resolution of this matter turns on the interpretation of an ambiguous term in the easements, the judgment entry of the trial court is reversed and this matter is remanded for the trial court to interpret the relevant language in the easements.

## STANDARD OF REVIEW

**{¶2}**    The standard of review for a dismissal for lack of subject matter jurisdiction, pursuant to Civ.R. 12(B)(1), is whether any cause of action cognizable by the forum has been raised in the complaint.  *Vos v. State*, 7th Dist. Columbiana No. 16 CO 0034, 2017-Ohio-4005, 91 N.E.3d 217, ¶ 15.   Subject matter jurisdiction can be raised by the trial court sua sponte at any time during the proceedings.  *Snyder Computer Sys. v. Sayas Auto Sales*, 7th Dist. Jefferson No. 09-JE-6, 2009-Ohio-6759, ¶ 15.   A court applying Civ.R. 12(B)(1) is not confined to the allegations of the complaint and may consider material pertinent to the subject matter jurisdiction inquiry.  *DeLost v. First Energy Corp.,* 7th Dist. Mahoning No. 07 MA 194, 2008-Ohio-3086, ¶ 17.   Lack of subject matter jurisdiction is a questions of law that we review de novo*.  Id.*

## PUCO JURISDICTION

**{¶3}**    The General Assembly enacted R.C. 4901.01 et seq. to regulate the business activities of public utilities and created PUCO to administer and enforce these

provisions. *Kazmaier Supermarket, Inc. v. Toledo Edison Co.*, 61 Ohio St.3d 147, 150, 573 N.E.2d 655 (1991). R.C. 4905.26 provides that PUCO shall hear complaints filed against public utilities alleging that "any regulation, measurement, or practice affecting or relating to any service furnished by the public utility, or in connection with such service, is, or will be, in any respect unreasonable, unjust, insufficient, unjustly discriminatory, or unjustly preferential."

**{¶4}** The Ohio Supreme Court has long recognized that the " 'jurisdiction specifically conferred by statute upon [PUCO] over public utilities of the state * * * is so complete, comprehensive and adequate as to warrant the conclusion that it is likewise exclusive.' " *State ex rel. N. Ohio Tel. Co. v. Winter*, 23 Ohio St.2d 6, 9, 260 N.E.2d 827 (1970), quoting State ex rel. Ohio *Bell Tel. Co. v. Cuyahoga Cty. Court of Common Pleas*, 128 Ohio St. 553, 557, 192 N.E. 787 (1934); *see* also *Kazmaier*, 61 Ohio St.3d at 152, 573 N.E.2d 655. Nonetheless, the broad jurisdiction of PUCO over service-related matters does not affect the basic jurisdiction of the court of common pleas in other areas of possible claims against utilities, including pure tort and contract claims. *State ex rel. Ohio Edison Co. v. Shaker*, 68 Ohio St.3d 209, 211, 625 N.E.2d 608 (1994).

**{¶5}** In deciding whether the claims raised by the complaint are pure contract or tort claims that do not fall within PUCO's exclusive jurisdiction, courts look to the substance of the claims. In other words, "[c]asting the allegations in the complaint to sound in tort or contract is not sufficient to confer jurisdiction upon a trial court when the basic claim is one relating to service, a claim which only [PUCO] has jurisdiction to resolve." *Higgins v. Columbia Gas of Ohio, Inc.,* 136 Ohio App.3d 198, 202, 736 N.E.2d 92 (2002). *See*, *also*, *State ex rel. Columbia Gas of Ohio, Inc. v. Henson*, 102 Ohio St.3d 349, 810 N.E.2d 953, 2004-Ohio-3208, ¶ 19.

**{¶6}** In *Allstate Ins. Co. v. Cleveland Elec. Illum. Co.*, 119 Ohio St.3d 301, 2008-Ohio-3917, 893 N.E.2d 824, ¶ 12-13, the Supreme Court of Ohio adopted a two-part inquiry to determine whether PUCO has exclusive jurisdiction over an action: First, is PUCO's administrative expertise required to resolve the issue in dispute? If the answer is "yes," a court must determine next if the act complained of constitutes a practice normally authorized by the utility. *Id.* at ¶ 11. If both questions are answered in the affirmative, the claim is within PUCO's exclusive jurisdiction. *Id.* at ¶ 12.

Case No. 18 HA 0002

{¶7} Nevertheless, the Ohio Supreme Court in *Allstate* acknowledged that PUCO is not a court and has no power to judicially ascertain and determine legal rights and liabilities. *Id.* at ¶ 6, citing *State ex rel. Dayton Power & Light Co. v. Riley*, 53 Ohio St.2d 168, 170, 373 N.E.2d 385 (1978). *See New Bremen v. Pub. Util. Comm.*, 103 Ohio St. 23, 30-31, 132 N.E. 162 (1921). Stated differently, "[PUCO] does not possess judicial power and may not adjudicate controversies between parties as to property rights." *Dayton Communications Corp. v. Pub. Util. Comm.*, 64 Ohio St.2d 302, 303-304, 414 N.E.2d 1051 (1980). The *Allstate* Court also categorically rejected the argument that every act by a utility is service-related. *Id.* at ¶ 6.

{¶8} An interested party may recover damages against the public utility for matters within PUCO's jurisdiction by invoking the formal complaint procedure outlined in R.C. 4905.61. If a customer or interested party establishes their claims, they may seek an award of treble damages against the utility in court. *DiFranco v. FirstEnergy Corp.*, 11th Dist. Geauga No. 2010-G-2990, 2011-Ohio-5434, 969 N.E.2d 1241, reversed on other grounds at 134 Ohio St.3d 144, 2012-Ohio-5445, 980 N.E.2d 996.

## DECLARATORY JUDGMENT

{¶9} A declaratory judgment action is a statutory in nature. R.C. 2721.03, reads, in pertinent part:

> * * *any person interested under a deed, will, written contract, or other writing constituting a contract or any person whose rights, status, or other legal relations are affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.* * *

{¶10} "To obtain declaratory judgment as an alternative to other remedies, a plaintiff must demonstrate three elements: (1) that a real controversy exists between

adverse parties; (2) which is justiciable in nature; (3) and that speedy relief is necessary to the preservation of rights which may be otherwise impaired or lost." *Fairview Gen. Hosp. v. Fletcher*, 63 Ohio St.3d 146, 148-49, 586 N.E.2d 80 (1992), citing *Herrick v. Kosydar*, 44 Ohio St.2d 128, 130, 339 N.E.2d 626 (1975). Parties to an easement commonly seek adjudication of disputed issues through the mechanism of declaratory judgment. *See*, e.g. *Cliffs & Creeks, L.L.C. v. Swallie*, 7th Dist. Belmont No. 17 BE 0039, 2018-Ohio-5410; *Hills & Hollers, LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 17 BE 0040, 2018-Ohio-2814, 116 N.E.3d 801, reconsideration denied, 7th Dist. Belmont No. 17 BE 0040, 2018-Ohio-3425, and appeal not allowed sub nom. *Hills & Hollers, L.L.C. v. Ohio Gathering Co.*, 154 Ohio St.3d 1464, 2018-Ohio-5209, 114 N.E.3d 215 : *Watson v. Caldwell Hotel, LLC*, 7th Dist. Noble No. 16 NO 0432, 2017-Ohio-4007, 91 N.E.3d 179.

{¶11} An easement is "the grant of a use on the land of another." *Hills & Hollers, LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 17 BE 0040, 2018-Ohio-2814, 116 N.E.3d 801, ¶ 28, reconsideration denied, 7th Dist. Belmont No. 17 BE 0040, 2018-Ohio-3425, ¶ 28, and appeal not allowed sub nom. *Hills & Hollers, L.L.C. v. Ohio Gathering Co.*, 154 Ohio St.3d 1464, 2018-Ohio-5209, 114 N.E.3d 215, ¶ 28, citing *Alban v. R.K. Co.*, 15 Ohio St.2d 229, 231-232, 239 N.E.2d 22 (1968). When an easement is created by an express grant, the easement's extent and limitations depend on the language in the grant. *Id.*, citing *Alban* at 232. When the terms of an easement are clear and unambiguous, a court cannot create new terms by finding an intent not expressed in the language used. *Id.*, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978). The language of the easement, considered in light of the surrounding circumstances, is the best indication of the extent and limitations of the easement. *State ex rel. Wasserman v. Fremont*, 140 Ohio St.3d 471, 2014-Ohio-2962, 20 N.E.3d 664, ¶ 28, citing *Apel v. Katz*, 83 Ohio St.3d 11, 17, 697 N.E.2d 600 (1998).

## THE EASEMENTS

{¶12} Appellee is a public utility providing electric service to its customers. Appellants own four parcels of land in Township of Nottingham, Harrison County. 12.1 acres of Appellants' property ("Property") are traversed by three separate easements.

The easements were executed in 1948 by previous owners of the Property. The easements contain identical language and grant to Appellee:

> the right to erect, inspect, operate, replace, repair, patrol and permanently maintain upon, over and along the above described right-of-way across said premises all necessary structures, wires and other usual fixtures and appurtenances used for or in connection with the transmission and distribution of electric current, and the right of ingress and egress upon, over and across said premises for access to and from said right-of-way, and *the right to trim, cut and remove* at any and all times *such* trees, limbs, *underbrush or other obstructions* as in the judgment of [Appellee] may interfere with or endanger said structures, wires or appurtenances, or their operation.

(Emphasis added)(Bloss Aff.; Exh. C).

**{¶13}** The parties agree that the easements are valid and enforceable. They further agree that the easements' language is clear and unambiguous. However, they disagree about the plain meaning of the term "remove" as it relates to the use of herbicide for vegetation control.

## FACTS AND PROCEDURAL HISTORY

**{¶14}** Appellants filed this declaratory judgment action seeking a statement of the parties' rights based on the contractual language of the easements in response to a written notice in 2017 that Appellee intended to apply herbicide to the Property. Appellants also requested an injunction prohibiting Appellee from applying the herbicide.

**{¶15}** Cross-motions for summary judgment were filed. Appellee did not assert that PUCO had exclusive jurisdiction over the issue raised by Appellants, but, instead, argued that the term "remove" should be broadly interpreted to fulfill the clearly-articulated purpose of the easements.

**{¶16}** After briefing was complete, the trial court conducted a final pretrial in an effort to facilitate a settlement. No argument or further evidence was presented at the

final pretrial conference, and the parties were unable to reach a compromise. On the same day, the trial court issued the judgment entry at issue here, finding sua sponte that PUCO had exclusive jurisdiction over the claims. (5/17/08 J.E.) This timely appeal followed.

{¶17} Appellee provided the following undisputed evidence. Appellee and its affiliated companies maintain approximately 7,000 miles of transmission lines in Ohio, including the double circuit high voltage transmission line on the Property, which carries 138,000 volts (or 138 kilovolts (kV))("Line"). The Line is connected to the grid, which carries electricity at high voltages over long distances to deliver bulk power to cities and neighborhoods served by Appellee and other utilities, including American Electric Power's Nottingham Substation and the Holmes-Wayne Electric Cooperative's Reedsburg substation.

{¶18} A fault or failure of the Line could adversely impact reliable service to an indeterminate number of customers served by Appellee and the substations. If the Line is too close to surrounding vegetation, it could result in outages from failure of the Line, as well as fire, serious injury, or death.

{¶19} Vegetation that contacts a transmission line is dangerous because it instantly becomes an alternate grounding path for the electricity, and the Line itself would short-circuit or fault if contact is made. Not only would a vegetation-line contact result in widespread outages, but vegetation contacting or growing in close proximity to a transmission line may start tree or brush fires, which can spread to surrounding vegetation and structures and cause severe property damage. Accordingly, prevention of vegetation/line contacts is critical to public safety and the reliability of the utility's operations.

{¶20} The National Electrical Safety Code ("NESC") has been adopted by PUCO and is codified in Ohio Administrative Code § 4901:1-10-06. It sets forth clearances that must be maintained between transmission lines and other objects to prevent unwanted contact with the lines. Vegetation that grows tall enough to encroach on established NESC clearance zones will interfere with the safe and reliable operation of the Line on the Property.

**{¶21}** Electric utilities became markedly more sensitive to the risks of transmission line-vegetation contacts after the 2003 blackout. As a result of the 2003 blackout, the Federal Electric Regulatory Commission ("FERC") and its enforcement arm, the National Electric Reliability Commission ("NERC"), developed standards and requirements to ensure that another blackout would not occur. Each utility was required to develop and implement a Transmission Vegetation Management Program ("TVM Program") as part of this effort, which adhered to established industry mandates for vegetation management near all transmission lines.

**{¶22}** Appellee's TVM Program complies with the mandates of the Ohio Adm. Code, NERC, FERC and ANSI (American National Standards Institute) A300. Appellee's TVM Program consists of a plan submitted to PUCO pursuant to Ohio Administrative Code § 4901:1-10-27(E)(1)(f) ("Plan") and a set of specifications detailing the Plan ("Specifications") developed for representatives charged with its implementation. The Specifications incorporate best management practices established by the ANSI A300 Standard for Tree Care Operation, Trees, Shrubs and Other Woody Plant Management and the Integrated Vegetation Management for Utility Rights of Way, an ANSI A300 companion publication.

**{¶23}** Because the results of vegetation contacts with a transmission line can be catastrophic, the goal of Appellee's TVM Program and those of other utilities is not simply to mitigate risk, but to totally eliminate incompatible vegetation with the potential to interfere with the safe and efficient operation of the transmission lines. Herbicide are a key component to the removal of incompatible vegetation such as underbrush.

**{¶24}** In targeting vegetation for removal, the TVM Program distinguishes "compatible" from "incompatible" vegetation. Incompatible vegetation is all vegetation that will grow tall enough to interfere with overhead electric facilities or which impedes the ability to visually inspect the transmission corridor from structure to structure. In contrast, compatible vegetation such as grass, forbs and small shrubs will never grow tall enough to affect the safety and reliability of the transmission system because it cannot reach sufficient height to threaten adequate clearances. Compatible vegetation is encouraged to grow and efforts are taken for its preservation.

Case No. 18 HA 0002

{¶25} Appellee's TVM Plan defines "vegetation control" as "the removal of vegetation that has the potential to interfere with the safe and efficient operation of the transmission system." (*Id.* at ¶ 6, Exh. A  3). The TVM Plan requires removal of all incompatible vegetation from edge to edge of the right of way that has the potential to interfere with the safe and efficient operation of the lines.  Herbicide is specifically mandated under the Specifications as the method to control incompatible vegetation less than six inches in diameter at breast height.

{¶26} Rogerio Maldonado, an ISA Certified Arborist, Utility Specialist, and a Transmission Forestry Specialist with over 33 years of experience in the green industry, opined that incompatible vegetation on the Property that meets the criteria of six inches in diameter or less at breast height must be removed through use of herbicide.  Otherwise, the vegetation may interfere with the safe operation of the transmission line. If such incompatible vegetation is left unmanaged, Maldonado opined that it could grow as high as 50-80 feet and interfere with the safe operation of the Line.

{¶27}  Maldonado and his forestry team developed a specific work plan for removal of incompatible vegetation from the Property in May of 2017 ("Work Plan"). The Work Plan required removal of incompatible vegetation on 3.9 acres or 32.2% of the total 12.1 acres encompassed by the easements on the Property, through the application of an herbicide registered with the Environmental Protection Agency.

{¶28}  Incompatible vegetation exceeding the threshold of six inches in diameter at breast height was cut down and removed with Appellants' permission on June 8, 2017 and June 12, 2017.  However, that effort provided only temporary "hot-spotting" measures to maintain adequate minimal clearance while this litigation was pending. Based on Maldonado's judgment and experience, herbicide must be applied to the 3.9 acres to prevent interference with the Line.  As of the date of his testimony, the Property was out of compliance with the specifications of the TVM Program.

{¶29}  Appellee concedes that herbicides have not been previously used to control incompatible vegetation on the easements.  Because prior vegetation had been removed without the use of herbicides in the past, the incompatible vegetation on the Property has become denser because the cut stumps sprouted numerous stems.  Maldonado opined that herbicide must now be used to properly maintain the Line.

**{¶30}** Salvatore Quattrocchi, the President of EnviroSolutions Group, an agricultural consulting firm serving public utilities and governmental agencies, with over 35 years of experience in the agricultural chemical specialty industry, opined that the herbicide proposed to be used on the Property is safe.  He further opined that Appellees' TVM Program is consistent with sound, accepted utility industry practices for application and use of such herbicide. Quattocchi warranted that the proposed herbicide will not have any effect on desirable plants, mammals, reptiles, insects, birds, or bee pollinators.

## ANALYSIS

**{¶31}**  Appellants advance a single assignment of error:

## ASSIGNMENT OF ERROR

 THE TRIAL COURT ERRED BY DISMISING  THE CORDERS' DECLARATORY JUDGMENT CLAIM THAT SEEKS THE CONSTRUCTION  OF THE EASEMENTS AND A DECLARATION OF THE PARTIES' RIGHTS THEREUNDER FOR LACK OF SUBJECT MATTER JURISDICTION.

**{¶32}**  In dismissing this action for lack of subject matter jurisdiction, the trial court relied exclusively upon our decision in *DeLost,* 2008-Ohio-3086.  The DeLosts filed an action to enjoin the utility from cutting white pine trees and vegetation they planted on a portion of their property subject to an easement.  The specific language of the easement at issue in *DeLost* is not quoted in the opinion, however we characterized the issue presented in that case as follows:  "[W]hether an action seeking to stop a utility company from cutting down trees within an easement that it owns is actionable exclusively with the PUCO or involves a pure contract claim that invokes the jurisdiction of the common pleas court." *Id.* at ¶ 24.

**{¶33}**  Applying the test announced in *State ex rel. Columbia Gas of Ohio v. Henson*, 102 Ohio St.3d 349, 2004-Ohio-3208, 810 N.E.2d 953, we cited numerous sections of the Ohio Administrative Code governing vegetation management and concluded that the issue presented in *DeLost*  was "manifestly service-related." *DeLost,*

supra, ¶ 40. We observed that, "[s]ince vegetation management within an easement is included in that chapter of the Ohio Administrative Code, we must conclude that cutting down vegetation is a practice relating to service as contemplated by R.C. 2905.26." *Id.*

**{¶34}** The decision in *DeLost* was cited with favor by the Ohio Supreme Court the following year in *Corrigan v. Illum. Co.,* 122 Ohio St.3d 265, 2009-Ohio-2524, 910 N.E.2d 1009 (2009). In *Corrigan*, the property owners filed a complaint for injunctive relief to prevent the utility from cutting a silver maple tree located within the utility's easement, which, according to the utility, had the potential to interfere with a power line. *Id.* at ¶ 2.

**{¶35}** The easement in *Corrigan*, which the Ohio Supreme Court concluded was unambiguous, read, in pertinent part:

> Said right and easement shall include the right of the Grantee, its successors and assigns, at all times to enter upon the right of way occupied by said transmission lines for the purpose of constructing, inspecting, protecting, repairing or removing said towers, wires, fixtures and appliances, together with full authority to cut and remove any trees, shrubs or other obstructions upon the above described property which may interfere or threaten to interfere with the construction, operation and maintenance of said transmission lines.

*Id.* at ¶18.

**{¶36}** The utility asserted that the trial court lacked subject matter jurisdiction over the action. *Id.* at ¶ 5-6. The trial court and the Eight District Court of Appeals disagreed, finding that no evidence had been offered to show that the silver maple tree threatened to interfere with the transmission lines. However, the Ohio Supreme Court reversed, holding that jurisdiction over Corrigan's claims rested with PUCO. *Id.* at ¶ 21.

**{¶37}** Applying the two-part test announced in *Allstate*, supra, the Supreme Court determined that the utility's "decision to remove a tree is governed by its vegetation-management plan, which is regulated by PUCO." *Id.* The Supreme Court further determined that the act complained of constituted a practice normally authorized by the

Case No. 18 HA 0002

utility because "[v]egetation management is necessary to maintain safe and reliable electrical service." *Id.* at ¶ 16.

**{¶38}** In its decision, the Ohio Supreme Court specifically rejected the property owners' argument that the issue was a matter of contract, because there was no question that the utility had a valid easement and that the tree was within the easement. *Id.* at ¶ 17. The Ohio Supreme Court found that the easement was unambiguous and granted to the utility the right to cut and remove any tree within the easement that could pose a threat to the transmission lines." *Id.* at ¶ 18-19. Because the case did not involve the interpretation of the language of the easement, but, rather, a challenge to the utility's discretion to cut and remove a tree under its vegetation management plan, the Ohio Supreme Court opined that the challenge involved a service-related issue that fell within PUCO's exclusive jurisdiction:

> It is clear from the record that the Corrigans are not contesting the meaning of the language of the easement but rather the company's decision to remove the tree instead of pruning it. In 2000, the company changed its vegetation-management plan so that its policy was to remove vegetation that threatened to interfere with its lines. Although the Corrigans disagree with this policy, the broad language of the easement granted to the company allows the utility to remove trees within its easement that may interfere or threaten to interfere with its power lines. Therefore, the Corrigans' complaint with the decision to remove the tree is really an attack on the company's vegetation-management plan. That type of complaint is a service-related issue, which is within PUCO's exclusive jurisdiction.

*Id.* at ¶ 20.

**{¶39}** Appellants correctly argue that the facts here are distinguishable from the facts in *Corrigan* and *DeLost.* In *Corrigan*, the Ohio Supreme Court conceded that the Corrigans did not challenge the utility's contractual right to cut and remove the tree at issue, but, instead, they challenged the utility's discretion to cut instead of prune. Although not overtly stated in *DeLost*, the easement in that case appears to have granted

Case No. 18 HA 0002

to the utility the contractual right to cut and remove trees and vegetation. In ceding jurisdiction to PUCO, both the Ohio Supreme Court and this Court recognized that the very determination sought by Appellants here was not raised in *Corrigan* and *DeLost*, that is, whether the easement grants to the utility the authority, rather than the discretion, to carry out the intended action.

**{¶40}** In the field of contract interpretation, clear and unambiguous contractual language is applied without consideration of extrinsic evidence. *Steubenville v. Jefferson Cty.,* 7th Dist. Jefferson No. 07 JE 51, 2008-Ohio-5053, ¶ 22, citing *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992). If a contract is reasonably susceptible to more than one meaning, then it is ambiguous and extrinsic evidence of reasonableness or intent can be employed. *Id.* Words and phrases are given their common and ordinary meanings absent specific contractual definitions. *Id.*, citing *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 212, 519 N.E.2d 1380 (1988)(unless manifest absurdity would result or an alternative meaning is clearly demonstrated in the contract).

**{¶41}** The easements grant Appellee the right to "cut, trim and remove such * * * underbrush or other obstructions as in the judgment of [Appellee] may interfere with or endanger said structures, wires or appurtenances, or their operation." Based on the punctuation of the phrase "cut, trim and remove," the term "remove" can be read as part of one conjunctive phrase – to "trim and remove," or two conjunctive phrases -- to "cut and remove" and "trim and remove." In other words, "remove" can be interpreted to mean "to haul away after cutting or trimming." Had the drafter intended to create three separate rights, he could have placed a comma after "cut." The drafter could have also used the disjunctive connecter – "or" – to show that "remove" was an alternative to cutting and trimming, rather than simply an act to follow the acts of cutting and trimming.

**{¶42}** Further, assuming that the right to "remove" was a third and separate right, which included any reasonable method to prevent interference with or endangerment of the Line as determined by the PUCO, the terms "cut" and "trim" would be superfluous. When interpreting a contract, a court must presume that words are used for a specific purpose and should avoid interpretations that render portions meaningless or unnecessary. *Wohl v. Swinney*, 118 Ohio St.3d 277, 2008-Ohio-2334, 888 N.E.2d 1062, ¶ 22 (2008).

**{¶43}** Appellants' interpretation of the term "remove" finds support in its common definitions. Dictionary.com provides the following alternative definitions for the term "remove":

> verb (used with object), re·moved, re·mov·ing.
>
> to move from a place or position; take away or off:
> to remove the napkins from the table.
> to take off or shed (an article of clothing):
> to remove one's jacket.

**{¶44}** Assuming arguendo that the term "remove" is ambiguous, Appellants assert that Appellee's literature addressing the maintenance of easements establishes that the parties could not have intended the term to include the use of herbicide. According to Appellee's publication, "Maintaining a Safe and Reliable Transmission System," Form 1189 (06-14), reads, in pertinent part, "[n]early 60 years of university and industry research also has shown that herbicide use on [rights-of-way] can help create optimum plant and wildlife habitats." (1/17/2008 Corder Mot., Exh. F 8). Appellants argue that the most generous mathematical calculation possible indicates that Appellee began using EPA-registered herbicide in 1954, six years after the execution of the easements at issue in this case.

**{¶45}** The same argument was advanced before the Supreme Court of West Virginia in *Kell v. Appalachian Power Co.,* 170 W.Va. 14, 289 S.E.2d 450 (1982). In 1939, the Kells' predecessors in interest granted the power company an easement over the property at issue, which allowed the power company to remove any trees, branches, or obstructions that might endanger the safety or interfere with the use of poles, wires, etc. *Id.* at 15, n. 1.The Kells filed a lawsuit to prohibit the power company from chemically spraying their property to kill vegetation. *Id.* at 16.

**{¶46}** In construing the 1939 easement, the *Kell* Court observed that the intent of the parties was controlling and, that the spraying of herbicide was unknown in 1939. *Id.* at 19. As such, the Court concluded that "[i]t was clearly not the intention of the parties to allow the power company to destroy all living vegetation within the area sprayed or

adjoining areas where these deadly herbicide could drift. Such action is not necessary to the protection of the power company's equipment." *Kell*, 170 W.Va. at 19, 289 S.E.2d at 456.

**{¶47}** The Kell Court concluded that the 1939 easement did not authorize the power company to apply herbicide. *Id.* at 20. At least one state intermediate court has likewise observed in dicta that the term "remove" in a utility easement does not include the use of herbicide, because "such chemicals do more than merely 'remove' existing plant structures." *Rutherford v. Centerpoint Energy Houston Electric Co.,* 1st Dist. Fort Bend No. 01-10-00186-CV, 2011 WL 3359712, fn. 1 (Texas).

**{¶48}** Appellee, on the other hand, argues that "remove" is an unambiguous term, and that herbicide is a method of removal subject to the discretion of the PUCO. In other words, because the determination here involves Appellee's methods and practice, Appellee asserts that it falls within the exclusive jurisdiction of the PUCO. Appellee's broad interpretation of "remove" finds support in the stated purpose of the easement, which is to permit the utility to prevent interference with or danger to its structures, wires or appurtenances, or their operation.

**{¶49}** Next, Appellee argues that the uncontroverted evidence in the record supports the trial court's conclusion that the PUCO has exclusive jurisdiction over the application of the herbicide on the Property. To the contrary, the evidence offered by Appellees supports the conclusion that application of the herbicide is reasonable, not that the easement grants Appellee the authority to apply herbicide.

**{¶50}** When a utility cuts a tree, instead of pruning it, pursuant to the terms of an easement which grants the utility unlimited discretion to cut and remove trees, PUCO has exclusive jurisdiction to determine whether the utility's decision is reasonable. The same is true when a utility cuts a tree and is vested with unlimited discretion to determine whether a particular tree threatens its lines.

**{¶51}** Here, the terms of the easements limit the utility's authority to "cut, trim and remove" underbrush. Having determined that the term "remove" is subject to multiple interpretations, we find that the term "remove" is ambiguous.

**{¶52}** As a consequence, the issue presented in this action for declaratory and injunctive relief is pure contract and the trial court has subject matter jurisdiction to

interpret the easements. It is important to note that the trial court's determination on remand is limited in scope to the interpretation of the ambiguous term. In other words, should the trial court conclude that the easements grant the utility the authority to use herbicide, PUCO has exclusive jurisdiction over the reasonableness of the utility's decision.

## CONCLUSION

**{¶53}** Appellants' sole assignment of error has merit. Accordingly, this matter is remanded to the trial court to interpret the ambiguous term "remove" in the easements

Donofrio, J., concurs.

Waite, P.J., concurs.

Case No. 18 HA 0002

———————————————

For the reasons stated in the Opinion rendered herein, the assignment of error is sustained and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Harrison County, Ohio, is reversed. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**