**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as**
*Corder v. Ohio Edison Co.*, **Slip Opinion No. 2024-Ohio-5432.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5432

CORDER ET AL., APPELLEES, *v.* OHIO EDISON COMPANY, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Corder v. Ohio Edison Co.*, Slip Opinion No. 2024-Ohio-5432.]**

*Civil law—Easements—Public utilities—Dispute between utility company and landowners over whether easements permit utility company to use herbicides to control vegetation on the property subject to the easements—Court of appeals' judgment reversed and cause remanded to trial court for it to issue an entry awarding summary judgment to utility company.*

(No. 2023-0216—Submitted October 25, 2023—Decided November 20, 2024.)

Appeal from the Court of Appeals for Harrison County,

No. 21 HA 0008, 2022-Ohio-4818.

_____

DONNELLY, J., authored the opinion of the court, which DEWINE, STEWART, BRUNNER, and DETERS, JJ., joined. KENNEDY, C.J., dissented, with an opinion joined by FISCHER, J.

**DONNELLY, J.**

{¶ 1} This case is before us for a second time as a discretionary appeal from the Seventh District Court of Appeals. In the first appeal, we concluded that a court of common pleas had jurisdiction to consider claims about the scope of several easements granted to a public utility. Now we are asked to interpret the easements' language and determine whether the easements permit the public utility's use of herbicides to control vegetation on the property subject to the easements.

{¶ 2} The Seventh District concluded that the easements' language is ambiguous and does not authorize the public utility's use of herbicides. And on that basis, the appellate court affirmed the trial court's award of summary judgment to the property owners. Having reviewed the text of the easements, we reach the opposite conclusion. As a result, we reverse the judgment of the court of appeals and remand this case to the trial court.

## Background

{¶ 3} Ohio Edison Company holds easements and rights-of-way for the installation and maintenance of electrical transmission lines and necessary structures on property in Harrison County owned by Craig D. Corder, Jackie C. Corder, and Scott Corder. First granted in 1948, the easements allow Ohio Edison to "erect, inspect, operate, replace, repair, patrol and permanently maintain . . . all necessary structures, wires and other usual fixtures and appurtenances" for the transmission of electricity and grant Ohio Edison the "right to trim, cut and remove at any and all times such trees, limbs, underbrush or other obstructions as in the judgment of [Ohio Edison] may interfere with or endanger said structures, wires or appurtenances, or their operation."

{¶ 4} Nearly 70 years later, Ohio Edison notified the Corders that it intended to use herbicides to control vegetation growth on the property. This action, explained Ohio Edison, was part of its Transmission Vegetation Management Program—required under former Adm.Code 4901:1-10-27(E)(1)(f) (now

2

Adm.Code 4901:1-10-27(D)(1)(f)—to ensure that vegetation growth did not interfere with the safe operation and maintenance of the power lines. The Corders took exception to the planned use of herbicides and sued Ohio Edison, seeking a declaratory judgment that the easements do not grant Ohio Edison the right to use herbicides to manage vegetation on the property and an injunction preventing Ohio Edison from using herbicides on the property.

{¶ 5} Both Ohio Edison and the Corders filed motions for summary judgment. The trial court, however, dismissed the case for lack of jurisdiction, believing that the case fell within the exclusive jurisdiction of the Public Utilities Commission of Ohio. On appeal, the Seventh District reversed the trial court's judgment. *Corder v. Ohio Edison Co.*, 2019-Ohio-2639 (7th Dist.) ("*Corder I*"). But the appellate court also analyzed the easements, held that they are ambiguous concerning the use of herbicides, and remanded the case to the trial court to resolve the ambiguity. *Id.* at ¶ 51-53. We accepted jurisdiction over Ohio Edison's appeal and affirmed the court of appeals' determination that the trial court had jurisdiction to decide the case. *Corder v. Ohio Edison Co.*, 2020-Ohio-5220, ¶ 22-28 ("*Corder II*"). But we concluded that the Seventh District went too far in analyzing the easements. *Id.* at ¶ 29-30. As a result, we vacated that portion of the court of appeals' decision and remanded the case to the trial court. *Id.* at ¶ 31.[1]

{¶ 6} On remand, the trial court awarded summary judgment to the Corders. The trial court held that the easements' language is unambiguous; that it does not create a standalone right to remove trees, limbs, or underbrush by any method that Ohio Edison chooses; and that it does not permit the use of herbicides.

{¶ 7} Once again, the case returned to the Seventh District, and this time the court of appeals affirmed the trial court's judgment but disagreed with its reasoning. Unlike the trial court, the court of appeals concluded that the easements' language

---

1. Those readers who wish to know more about the factual background to and earlier appeals in this case can find greater detail in this court's opinion in *Corder II*, 2020-Ohio-5220.

granting the right to "trim, cut and remove" is ambiguous. 2022-Ohio-4818, ¶ 20 (7th Dist.) ("*Corder III*"). The court of appeals then turned to extrinsic evidence to discern the scope of the easements and concluded that Ohio Edison's course of conduct in exercising its rights under the easements since 1948 and the State's regulatory requirements for vegetation management did not support Ohio Edison's assertion that the easements permit the use of herbicides. *Id.* at ¶ 21-26. Then, despite holding that the easements' language is ambiguous, the court of appeals returned to the easements' language, holding that the grammatical structure of the language shows that the easements do not give Ohio Edison a right to remove vegetation from the property by any means it chooses. *Id.* at ¶ 27-29.

{¶ 8} Ohio Edison appealed to this court raising two propositions of law. We accepted jurisdiction over the second proposition, which ultimately requires us to determine whether the easements permit Ohio Edison to use herbicides to control vegetation on the property. 2023-Ohio-1326.

**Analysis**

{¶ 9} To resolve this case, we must determine the scope of Ohio Edison's easements over the Corders' property. The trial court resolved this issue below on summary judgment, so we review the matter de novo, *Grafton v. Ohio Edison Co.*, 1996-Ohio-336, ¶ 10. Summary judgment is appropriate when no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds—viewing the evidence in favor of the nonmoving party—can only reach a conclusion adverse to the nonmoving party. *See* Civ.R. 56(C).

{¶ 10} The principal source for determining the scope of an easement is its language. Easements are a form of contract; as a result, courts are to interpret them "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language," *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244 (1974), paragraph one of the syllabus. "When an easement is created by an express grant . . . the extent of and limitations on the use of the land depend on the language in

the grant." *State ex rel. Wasserman v. Fremont*, 2014-Ohio-2962, ¶ 28 (plurality opinion), citing *Alban v. R.K. Co.*, 15 Ohio St.2d 229, 232 (1968). And if the easement's terms "are clear and unambiguous, a court cannot create a new agreement by finding an intent not expressed in the clear language employed by the parties." *Id.*, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246 (1978).

{¶ 11} The trial court determined that the easements here are unambiguous and that they deny Ohio Edison the right to use herbicides on the property. The court of appeals agreed with the judgment, but it disagreed with the trial court's reasoning. The court of appeals concluded that the easements' language is ambiguous and that the ambiguity should be resolved in the Corders' favor. *Corder III*, 2022-Ohio-4818, at ¶ 29-30 (7th Dist.). Neither Ohio Edison nor the Corders argue in this court that the easements' language is ambiguous. But given that the easements' alleged ambiguity was the basis for the court of appeals' decision affirming summary judgment for the Corders, it helps to begin our analysis with the question of ambiguity.

### *The easements unambiguously allow Ohio Edison to remove trees, limbs, underbrush, and other obstructions from the property*

{¶ 12} The easements grant Ohio Edison several rights. Of relevance here is a clause contained in each easement that permits Ohio Edison to "trim, cut and remove at any and all times such trees, limbs, underbrush or other obstructions" that Ohio Edison believes "may interfere with or endanger" its infrastructure or operations. Ohio Edison argues that the easements' language is unambiguous and creates three distinct rights—a right to trim, a right to cut, and a right to remove trees, limbs, underbrush, and other obstructions. The court of appeals disagreed, concluding that the language is ambiguous and that the lack of a comma between the words "cut" and "remove" and the use of the word "and" rather than "or" means that the easements do not create a separate right to remove vegetation from the

easement property "by any means" that Ohio Edison chooses. *Id*. at ¶ 20, 28. We disagree with the appellate court's analysis and conclusion.

{¶ 13} The court of appeals concluded that the easements' language is ambiguous because the word "remove" is subject to multiple interpretations. *Corder III* at ¶ 20; *see also Corder I*, 2019-Ohio-2639, at ¶ 51 (7th Dist.). But that conclusion stems from a fundamental misunderstanding of ambiguity.

{¶ 14} The mere fact that a contract's text might be subject to competing interpretations does not mean that the text is ambiguous. *See Corder II*, 2020-Ohio-5220, at ¶ 38 (DeWine, J., concurring in part and dissenting in part). Rather, for a contract to be ambiguous, its terms must be "susceptible to more than one *reasonable* interpretation." (Emphasis added.) *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12, citing *Motorists Mut. Ins. Co. v. Ironics, Inc.*, 2022-Ohio-841, ¶ 14. If on closer inspection it becomes clear that one of the two competing interpretations "strain[s] ordinary usage or conflict[s] with the structure or purpose of the text as a whole," then that interpretation is not reasonable and does not make the contractual text ambiguous. *Corder II* at ¶ 38 (DeWine, J., concurring in part and dissenting in part), citing *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 41 (2008). It is the construction and context of a provision that reveals whether it is subject to multiple reasonable interpretations creating ambiguity. And to properly interpret the terms of an easement, courts look not to words or phrases in isolation but to the whole text. *See Saunders v. Mortensen*, 2004-Ohio-24, ¶ 16, citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997) ("[A] contract is to be read as a whole and the intent of each part gathered from a consideration of the whole."). And when we do that here, it becomes clear that for the easements to have any coherent meaning, they must give Ohio Edison a separate right to remove vegetation beyond the right to trim and to cut trees, limbs, underbrush, and other obstructions.

{¶ 15} In its interpretation of the easements, the court of appeals also reasoned that the phrase "trim, cut and remove" could—based on the phrase's punctuation—be interpreted two ways. One reading interprets the language as creating a single conjunctive phrase that grants Ohio Edison the right to "cut and remove" trees, limbs, underbrush, and other obstructions. The other reading creates two conjunctive phrases, which grant Ohio Edison both the right to "cut and remove" and the right to "trim and remove" trees, limbs, underbrush, and other obstructions. Neither reading, concluded the appellate court, creates a separate, third right to "remove" those items. *Corder I* at ¶ 41; *see also Corder III*, 2022-Ohio-4818, at ¶ 19 (7th Dist.) (adopting the reasoning of *Corder I*). At first glance, at least one of these readings appears reasonable. The second reading, which connects "remove" to both "trim" and "cut," would allow Ohio Edison to trim or cut trees, limbs, underbrush, and other obstructions, but only if Ohio Edison also removed what it trimmed or cut. The first reading, which connects "remove" only to "cut," starts to strain credulity. Under that reading, Ohio Edison could cut trees, limbs, underbrush, and other obstructions, provided that it removed what it cut. And Ohio Edison could trim those various obstructions, but it could not remove what it trimmed, because, under that reading, "remove" is connected to "cut," not "trim." And both readings proposed by the court of appeals isolate the phrase "trim, cut and remove" from the remainder of the text granting the right. And when the phrase "trim, cut and remove" is read in context, issues with both of the court of appeals' proposed interpretations of the phrase become apparent.

{¶ 16} The easements give Ohio Edison the authority to "trim, cut and remove . . . trees, limbs, underbrush *or other obstructions*" (emphasis added) that "may interfere with or endanger" its infrastructure or operations. While the text provides specific examples of items that Ohio Edison may trim or cut—trees, limbs, and underbrush—it also provides a catchall provision—"other obstructions." This provision undercuts the narrow interpretation of the easements. "Other

obstructions" can reasonably be construed to include obstructions other than vegetation that may endanger or interfere with Ohio Edison's infrastructure or operations. *See Corder II* at ¶ 43 (DeWine, J., concurring in part and dissenting in part) (reasoning that "'other obstructions' . . . could include a stone wall, a treehouse, or a kite caught on the power lines"). An easement is to be "interpreted to give effect to the language used in the instrument and to carry out the purpose for which it was created." *Wasserman*, 2014-Ohio-2962, at ¶ 33 (plurality opinion). Because the easements contemplate the existence of dangers and interferences that cannot be remedied simply by cutting or trimming, they must also provide a means by which those obstructions can be remedied. It follows, then, that the easements' use of the word "remove" gives Ohio Edison a right—beyond that of trimming and cutting—to remove "trees, limbs, underbrush or other obstructions" to prevent them from interfering with or endangering its infrastructure or operations.

{¶ 17} Also crucial to the court of appeals' conclusion that the easements do not give Ohio Edison an independent right to remove vegetation from the property is the lack of a comma between "cut" and "remove" in the easements' text. *Corder III* at ¶ 28; *see also Corder I*, 2019-Ohio-2639, ¶ 41 (7th Dist.). But this interpretation gives greater importance to the comma than it is due.

{¶ 18} Generally, "[w]hen a conjunction joins the last two elements in a series of three or more, a comma—known as the serial or series comma or the Oxford comma—should appear before the conjunction." *The Chicago Manual of Style* § 6.19 (17th Ed. 2017). This usage is meant to prevent ambiguity, *id*., by ensuring that "the final two items in a list aren't seen as having a special relationship, aren't seen after a number of singletons as somehow constituting a couple," Dreyer, *Dreyer's English* 24 (2019). But the mere presence or absence of a series comma is not dispositive as to whether a construction is ambiguous or to the phrase's meaning.

**{¶ 19}** At times, the presence of the series comma does not make an ambiguous construction unambiguous. Take for example a clause in a will leaving the testator's estate to "my mother, Jane and Sally."[2] As written the clause is unclear—is the estate to be split in half with one share going to the testator's mother and the other share going to Jane and Sally to split? Or is the estate to be split into thirds, with the devisees taking an equal share? To be sure, the insertion of a comma before the conjunction at the end of the list would make clear that Jane and Sally are not to split one share between them. But even with the series comma, the sentence's structure—now devising the estate to "my mother, Jane, and Sally"— could be understood as creating a parenthetical appositive, indicating that the testator's mother is Jane. *See The Chicago Manual of Style* § 6.19 (noting that a series comma can in some circumstances be read to create an appositive and that it therefore does not always prevent ambiguity). In short, the addition of a series comma while attempting to resolve one ambiguity simply creates another one—is the author listing two or three people?

**{¶ 20}** And just as the presence of the series comma does not always resolve ambiguity, its absence does not always create it. Consider the sentence "He teaches French, German, Italian and Spanish." A strict application of the theory supporting use of the series comma would suggest that because there is no comma before the conjunction at the end of the sentence there is some ambiguity about the subjects our polyglot teaches. But in this construction, the reader knows that the commas used in the series are replacing repeated use of the word "and." In other words, readers understand that the sentence means that he teaches French *and* German *and* Italian and Spanish, even though it is not spelled out. *See* Fowler, *A Dictionary of Modern English Usage* 588 (2d Ed. 1965). Thus, the inclusion of the series comma

---

2. This hypothetical finds its genesis in the discussions found in *The Chicago Manual of Style* § 6.19 and Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 165-166 (2012) concerning the ambiguity that can arise when the series comma is not used.

in this construction would be redundant.  *Id.*  Or, at the very least, its omission does not create an ambiguity.

{¶ 21} One final consideration counsels against seeing the absence of the series comma in the phrase "trim, cut and remove" as dispositive on the issue of the phrase's meaning or possible ambiguity.  Along with the clause at issue here, the easements use lists to grant Ohio Edison a whole slew of rights.  This includes "the right to erect, inspect, operate, replace, repair, patrol and permanently maintain" on the property "all necessary structures, wires and other usual fixtures and appurtenances."  And it includes "the right of ingress and egress upon, over and across" the property.  None of these lists uses the series comma.  Yet from the construction and context of the various clauses, the reader is left with no doubt about what rights are being granted.  Simply because there is not a series comma before the conjunction in any of these clauses does not lead to ambiguity.  For example, no reader would interpret Ohio Edison's right to permanently maintain its infrastructure on the property as inseparable from (or contingent on) its right to patrol its infrastructure on the property.  Nor would any reader conclude that Ohio Edison's right to enter or exit "over" the property could be exercised only if Ohio Edison also entered or exited "across" the property at the same time, all because of the lack of a series comma.  Given the easements' consistent eschewing of the series comma, it makes little sense to give its absence dispositive weight as to how the easements should be interpreted.

{¶ 22} At bottom, then, while the series comma can prevent ambiguity much of the time, thereby clarifying a phrase's meaning, its inclusion or omission is not dispositive as to whether a text is ambiguous.  Rather, it is the context and construction of a phrase or a clause that creates or resolves ambiguity and dictates meaning.  And, as discussed earlier, when the phrase "trim, cut and remove" is placed in the broader context of the easements, one meaning becomes apparent, irrespective of the lack of the series comma.

{¶ 23} Because we conclude that the easements grant Ohio Edison the right and authority to remove trees, limbs, underbrush, and other obstructions from the property, we turn now to whether that right permits Ohio Edison to use herbicides to accomplish those tasks.

### *The easements permit Ohio Edison's use of herbicides to remove trees, limbs, underbrush, and other obstructions*

{¶ 24} Having determined that the easements grant Ohio Edison the right to remove vegetation and other obstructions that may interfere with its infrastructure or operations, the next step in our analysis is to determine whether that right includes the right to use herbicides. Both the plain meaning of the word "remove" and the way the word has been understood and applied by Ohio's courts lead us to conclude that it does.

{¶ 25} When interpreting the language of an easement, courts give words their "plain and ordinary meaning." *Alexander*, 53 Ohio St.2d at 245-246. And one tool courts may use to help them discern the common and ordinary meaning of words is dictionaries. *See Athens v. McClain*, 2020-Ohio-5146, ¶ 30, citing *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic*, 62 Ohio St.3d 297, 300 (1991). Dictionaries from the time when the easements were drafted give a broad definition of "remove." To be sure, those definitions include those advanced by the Corders. For instance, *Webster's New International Dictionary* (2d Ed. 1953) defines "remove" as "[t]o change or shift the location, position, station, or residence of," and "[t]o move by lifting, pushing aside, taking away or off, or the like." And it is easy to see how those definitions would apply to the easements' language in the context of vegetation that Ohio Edison trims or cuts. But *Webster's New International Dictionary* also defines "remove" as "[t]o get rid of, as though by moving; to eradicate; *to eliminate*." (Emphasis added.) *Id.* Not only does that dictionary specify that "remove" can mean the eradication or elimination of

something, but that definition is a more suitable definition given the easements' language as a whole.

{¶ 26} Interpreting "remove" in the easements as permitting Ohio Edison to eradicate or eliminate trees, limbs, or underbrush does not cause the easements' grant of the rights to trim and to cut those items to become meaningless or without effect. Rather, that interpretation merely contemplates methods of remedying the dangers that those items pose that do not involve trimming or cutting—such as removing a tree stump or uprooting a plant. *See Corder II*, 2020-Ohio-5220, ¶ 42 (DeWine, J., concurring in part and dissenting in part). Similarly, when one remembers that the easements' language also covers "other obstructions," which (as discussed earlier) might include items that are not vegetation and cannot be trimmed or cut, it makes sense that "remove" can be interpreted to mean the eradication, elimination, or getting rid of this class of obstruction.

{¶ 27} Thus, in the context of the easements' language as a whole, "remove" should be given a broad definition, including the moving *and* the elimination or eradication of trees, limbs, underbrush, and other obstructions.

{¶ 28} This interpretation of "remove" is also consistent with the way this court has defined the term in other cases. For example, in *Hewitt v. L.E. Myers Co.*, 2012-Ohio-5317, this court was asked to interpret the phrase "deliberate removal" as that phrase is used in R.C. 2745.01(C)'s prohibition of the removal of equipment safety guards by employers. After looking to the various definitions of "remove" cited by the appellate courts in that case, this court gave a broad definition of "removal" as lifting, pushing aside, taking off or otherwise eliminating. *Id.* at ¶ 28-30. To be sure, *Hewitt* is not dispositive here, but it is instructive that the definition of "remove" is dictated by its context. And, like in this case, the context in *Hewitt* supported interpreting "remove" broadly to include eliminating or getting rid of an object, rather than just taking the object away or moving it.

{¶ 29} All told, the ordinary meaning of the easements' language includes the commonly understood meaning of "remove" as including the eradication or elimination of an object (here, vegetation and other obstructions), as well as the movement of the object. The final question, then, is whether the easements allow Ohio Edison to use herbicides as a means of removal. They do.

{¶ 30} Limitations on the use of land subject to an easement "depend on the language in the grant" that created the easement. *Wasserman*, 2014-Ohio-2962, at ¶ 28 (plurality opinion). While the language here does not expressly permit the use of herbicides, it also does not prohibit their use. Indeed, there is no language in the easements limiting the means by which Ohio Edison may remove vegetation or other obstructions that may interfere with or endanger its infrastructure on the property. Quite the opposite. The easements' language is expansive, giving Ohio Edison the right to remove obstructions "at any and all times." In short, nothing in the easements' language suggests restrictions on how Ohio Edison might remove obstructions. Given this lack of restriction, it follows that because the herbicides Ohio Edison intends to use will get rid of vegetation that may interfere with or endanger Ohio Edison's infrastructure or operations, the use of herbicides falls squarely within Ohio Edison's right to "remove," as in, to eradicate" and "to eliminate" the vegetation.

{¶ 31} That the drafters of the easements did not contemplate or foresee Ohio Edison's use of herbicides is of no import. First, as discussed earlier, the rights and limitations of the easements find their source in the easements' text. And nothing in the text restricts or prohibits the use of herbicides as a method of removing obstructions. Second, provided that an easement's language does not prohibit it, an "easement holder 'is entitled to vary the mode of enjoyment and use of the easement by availing himself of modern inventions if by doing so he can more freely exercise the purpose for which the grant was made.'" *Crane Hollow, Inc. v. Marathon Ashland Pipe Line, L.L.C.*, 138 Ohio App.3d 57, 67 (4th Dist.

2000), quoting *Ohio Oil Gathering Corp. II v. Shrimplin*, 1990 WL 108737, *2 (5th Dist. July 23, 1990); *see also Reagan v. Sturges*, 2016-Ohio-8226, ¶ 19 (11th Dist.). The easements' purpose is to permit the removal of vegetation and other obstructions from the property that may interfere with or endanger Ohio Edison's infrastructure or operations. And herbicides are a modern invention that promotes that purpose. As a result, we conclude that the easements permit Ohio Edison to use herbicides to remove vegetation from the property.

### Conclusion

{¶ 32} In sum, we conclude that the easements' language unambiguously grants Ohio Edison the right to remove vegetation and other obstructions that may interfere with or endanger its infrastructure or operations on the Corders' property. We also conclude that the right to remove includes the right to use herbicides. As a result, we reverse the judgment of the Seventh District Court of Appeals affirming the trial court's award of summary judgment to the Corders. Because this opinion conclusively resolves the scope of Ohio Edison's rights under the easements on this subject, we remand this case to the trial court for it to issue an entry awarding summary judgment to Ohio Edison.

Judgment reversed

and cause remanded to the trial court.

—————————

**KENNEDY, C.J., joined by FISCHER, J., dissenting.**

{¶ 33} Powerline easements executed in 1948 grant an electric-utility company the "right to trim, cut and remove at any and all times such trees, limbs, underbrush or other obstructions as in the judgment of [the utility company] may interfere with or endanger [the company's] structures, wires or appurtenances, or their operation." The majority's extended grammar lesson is not needed to understand that this language unambiguously grants the electric-utility company the right to remove vegetation from the easements by means other than just

14

trimming or cutting it; people decades ago often did not use Oxford commas, so the easements grant three separate rights: to trim, to cut, and to remove. Nor is it unclear what the word "remove" commonly means. It means "[t]o move by lifting, pushing aside, taking away or off, or the like." *Webster's New International Dictionary* (2d Ed. 1942). And "remove" also means "[t]o get rid of, *as though* by moving; to eradicate; to eliminate." (Emphasis added.) *Id.*

{¶ 34} But that is not the end of the analysis. The real question in this case is whether appellant, Ohio Edison Company, would actually remove vegetation if it uses herbicides on the powerline easements running across the land owned by appellees, Craig D. Corder, Jackie C. Corder, and Scott Corder. The word "remove" does not contemplate that vegetation will be left behind but prevented or inhibited from regrowing. But that is what Ohio Edison does when it uses herbicides.

{¶ 35} According to Ohio Edison's own brief, using herbicides purportedly "remove[s]" vegetation because the herbicides are "absorbed into the plant's root system, which prevents the vegetation from regrowing and continuing to threaten the electric lines." An employee of First Energy Service Company, which is a company that provides vegetation-management services to Ohio Edison, "noted in 2017 that the brush [on the Corders' property] that was last cut in June, 2014 had experienced regrowth because the stumps were not treated [with herbicides]." Additionally, the manager of First Energy's Transmission Vegetation Management explained that herbicides control the vegetation that is incompatible with a safe and reliable electricity-transmission system "so that suckering or resprouting does not occur," and she said that the vegetation "cannot be mowed or removed without the use of herbicides to control resprouting and suckering of the removed stem."

{¶ 36} That is, Ohio Edison uses herbicides to *prevent* the growth of plants. But inhibiting regrowth of vegetation is not the same thing as removing it. If the

stems, stumps, or roots remain in the easement, then they cannot be said to have been removed.

{¶ 37} For these reasons, an easement granting an electric-utility company "the right to trim, cut and remove" does not grant the company the right to use herbicides to inhibit or prevent future growth of vegetation. The judgment of the Seventh District Court of Appeals should be affirmed, albeit for different reasons than expressed in that court's opinion. Because the majority does not affirm the court of appeals' judgment, I dissent.

_____

Kidder Law Firm, L.L.C., Steven R. R. Anderson, and Charles L. Kidder; and Arenstein & Andersen Co., L.P.A., Nicholas I. Andersen, and Eric R. McLoughlin, for appellees.

Roetzel & Andress, L.P.A., and Denise M. Hasbrook; and Benesch, Friedlander, Coplan & Arnoff, L.L.P., and James E. von der Heydt, for appellant.

Dave Yost, Attorney General, Michael J. Hendershot, Chief Deputy Solicitor General, and Byers Emmerling, Assistant Attorney General, urging reversal for amicus curiae Attorney General Dave Yost.

Porter Wright Morris & Arthur, L.L.P., Ryan P. Sherman, and Syed Ahmadul Huda; Bricker Graydon, L.L.P., Sommer L. Sheely, and Devin D. Parram; Flagel & Papakirk, L.L.C., and James Papakirk; McDonald Hopkins, L.L.C., and Adam C. Smith; Kurt Helfrich and Lija Kaleps-Clark; and Brian J Pokrywka and Jeanne W. Kingery, urging reversal for amici curiae Vectren Energy Delivery of Ohio, L.L.C., the Dayton Power and Light Company, Columbia Gas of Ohio, Inc., AEP Ohio Transmission Company, Inc., Ohio Power Company, Buckeye Power, Inc., Ohio Rural Electric Cooperatives, Inc., and Duke Energy Ohio, Inc.

_____